[No. F023273. Fifth Dist. Apr. 24, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS LIGHT, JR., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II through VI of Discussion.

## Counsel

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, and W. Scott Thorpe, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

MARTIN, J.—A jury convicted the defendant, Louis Light, Jr., as charged in counts 1 and 2 with rape (Pen. Code, § 261, subd. (a)(2)),[1] in count 3 with genital penetration (§ 289, subd. (a)), in count 4 with sexual battery (§ 243.4, subd. (a)), in count 5 with second degree burglary (§ 460, subd. (b)), and in count 6 with second degree robbery (§ 212.5, subd. (b)). The jury also found defendant used a deadly weapon, a "club," in the commission of the four sex offenses (§§ 12022.2, subd. (a), 12022, subd. (b)) and he inflicted great bodily injury in the commission of the two rapes (§ 12022.8). The court sentenced him to an aggregate term of 52 years in state prison.

On appeal Light contends the trial court committed several instructional errors. He also challenges the sufficiency of the evidence to support the weapon use enhancements.

### FACTS

At approximately 11:30 on the morning of November 8, 1994, Donna H. received a telephone call at her real estate office about a vacant house she had listed for sale in Bakersfield. The caller, a man, said he recently had been transferred to the area and had been referred to her by a coworker named Smith. Donna, who had a client by that name, agreed to meet the man and his wife at the house at 12:15 p.m.

Donna arrived a little early. There was no other car at the house but she noticed a green pickup parked nearby which she took to be a gardener's truck. She unlocked the front door and went into the house, leaving her purse, briefcase and other items in her car.[2] As she opened the blinds in the dining area, she heard a noise behind her. She turned and found Light standing about five feet away. He wore dark wraparound sunglasses and was holding a dowel, similar to a closet pole, in his two hands in front of him. He said: "get down on the floor, get down on the floor or you'll get hurt, get down on the floor and you won't get hurt." His voice sounded like the person who had phoned earlier.

Donna ran through the family room toward the kitchen but there she caught sight of a second person standing between her and the only other exit.

---

[1]All future statutory references are to the Penal Code unless indicated otherwise.

[2]Donna gained entry with a key stored in a "lock box" to which she and other real estate agents had keys. The house was empty and all the doors ordinarily would have been locked. However, Theresa Clark, who did not have a lock box key, testified she stopped to look at the house earlier the same day; she was able to get in by going through a side gate, then through a door from the yard into the garage, and finally through a door from the garage into the house. The gate and the two doors were all unlocked.

She did not see the person's face, only his torso. She turned and headed back down the hallway toward the entry but Light grabbed her by the arm and pulled her into the kitchen. There he and the other man forced her to the ground both with their hands and with something on her back she assumed was the "stick." Light ordered Donna to keep her face down and her eyes closed, and not to move or say anything lest she get hurt. She complied out of fear for her life.

Light put the dowel down on the floor near Donna's head while the two men removed the rings from her fingers, two from each hand. A few minutes passed during which Donna was aware of some activity in the kitchen before Light returned and started to undress her. She caught sight of his face when he turned her over in the process of removing her clothes. With Donna on her back, Light lifted her blouse over her head, pulled up her bra, and fondled her breasts with his hands. The blouse blocked her view but she assumed the dowel was still nearby.

Light then stood Donna up, walked her backwards into the hallway, and put her down on her back on the floor. Once again he lifted her blouse over her head and fondled her breasts, kissing her left breast. He put his finger inside her vagina. Then he put his penis in her vagina. He ordered her to turn over onto her hands and knees whereupon he put his penis in her vagina a second time until he ejaculated.

Light got up and Donna, still facedown on the hall floor with her eyes closed, heard him moving about. She could not tell whether the second man was still in the house, but assumed so. Light asked her whether her purse was in her car; she responded it was. She remained on the floor for a while longer until she heard the front door close, and then she ran to a nearby house for help. Donna's purse was missing from her car and was never recovered. Police summoned to the scene found her clothes in a hall closet and the dowel on the kitchen floor. One of the closets was missing such a pole.

The results of a sexual assault examination performed later that day were consistent with Donna's account of having had nonconsensual sexual intercourse. Subsequent tests on swabs taken at the hospital confirmed the presence of semen in her vagina and saliva on her breast.

The hospital also took X-rays of Donna's right foot which was by then painful and swollen. She gave the X-rays to a doctor who had performed bunion surgery on her foot some two months earlier. He thereafter performed additional surgery to remove a dislodged pin and to reset a surgical fracture which had reopened.

Around 12:45 in the afternoon of the incident, Margaret Rimmer saw the driver of a lime-green pickup, whom she was unable to describe, run from the truck to a dumpster with a purse in his hand matching the description of the purse stolen from Donna's car. A few minutes later Bobby Mahaffey, a construction inspector for the City of Bakersfield, was sitting in his truck eating lunch and listening to a police scanner when he heard an all-points bulletin for a lime-green Dodge pickup. Soon afterward he saw a truck matching that description. He wrote down the license number and contacted police. Upon determining the truck was registered to Light, the police included his picture in a photo lineup which they showed to Donna the next day. She picked out Light, saying he looked like the person who raped her but she could not be sure because the light in the house had been dim and the perpetrator had been wearing sunglasses.[3]

On the basis of Donna's identification, the police obtained a search warrant for Light's home and truck. In his home they found a pair of sunglasses which Donna said were similar to those worn by her assailant. They also found "a real estate ad with a real estate agent's name on it." They arrested Light and impounded his truck but found nothing significant in it during their initial search. During a subsequent phone call from jail, however, Light told his wife that one of Donna's rings was hidden in the finger of a glove in the truck. Light's wife passed this information on to police, who found the ring during a further search.

Light made two other significant admissions after his arrest. During one of his frequent phone calls to his wife he told her roommate, Aerin Easterwood, that he knew when he woke up on the day of the incident he was going to do "something wrong." He said he had recruited an "ex-con" from the homeless shelter to help him in his tree-trimming business and together they hatched a plan to "rip off" the real estate lady at the house where his truck was spotted. They went there with that intention only but "something snapped" and he (Light) raped her while the other man waited outside.

Light gave a similar account in a letter to Irma Peterson, his wife's grandmother. He wrote in part: "That day the crime happened, I knew I was going to do something wrong. That morning I went down to the shelter to find a worker & I probly [sic] found the most dirty convict you could ever imagine. Now my thoughts were not to find a woman and rape her, what I was thinking was I know I am going to get into trouble. We started to do my houses & I'll say about every other house we did he would . . . suggest let[']s get that house it will have money & jewels. At first I blew him off,

---

[3]At trial Donna positively identified Light as the person who raped her, saying she had "no doubts" about her identification.

then I started thinking some extra money would be nice.—Not that tree trimming wasn't doing good enough. I just wasn't thinking. Then I droped [*sic*] off the trailer & we came up with the plan. . . ."

Tests on the semen and saliva samples gathered from Donna at the hospital showed Light was included in the group of potential donors representing about 30 percent of the population. Fingerprints and shoe prints collected by the police at the house did not match those taken from Light.

## DISCUSSION

Light raises the following issues on appeal: (1) the adequacy of the court's reasonable doubt instruction (CALJIC No. 2.90), (2) the court's refusal to limit to the two nonsex offenses CALJIC instruction No. 2.15 regarding an inference of guilt to be drawn from a defendant's conscious possession of recently stolen property, (3) the court's failure to give a unanimity instruction as to the sexual battery charge (CALJIC No. 17.01), (4) the sufficiency of the evidence to support the weapon use enhancements, (5) the court's failure to give an armed enhancement instruction, and (6) the court's failure to give a causation instruction as to the great bodily injury enhancements (CALJIC No. 3.40).

## I.  *The Reasonable Doubt Instruction*

The court gave a reasonable doubt instruction based on a 1994 revision to CALJIC No. 2.90 which deleted references in the earlier version to "moral evidence" and "moral certainty." The second part of the instruction, with the deletions indicated in brackets, provided: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs[, and depending on moral evidence,] is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction[, to a moral certainty,] of the truth of the charge."[4]

Light contends the revised instruction, by omitting the phrase "moral certainty" and thus defining reasonable doubt only in terms of an "abiding conviction," "gave the jury no guidance as to the level of certainty to which it must be persuaded before it could reliably determine that the prosecution

---

[4]The definition of reasonable doubt in the earlier version of CALJIC No. 2.90 is taken from section 1096. Section 1096 was amended effective July 3, 1995, after the trial in this case, to conform to the revised instruction. The trial court "may," but is not required to give a reasonable doubt instruction utilizing the language of section 1096. (§ 1096a; *People* v. *Freeman* (1994) 8 Cal.4th 450, 503 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

had met its burden of proof beyond a reasonable doubt." Without "some other language to convey the concept that a standard of proof necessarily reflects a degree of certainty," he maintains the instruction permitted the jury to convict him upon a lesser standard than due process requires.[5]

In arguing the instruction's "abiding conviction" language fails to adequately define reasonable doubt, Light relies in part on Justice Mosk's criticism of the phrase in his concurring opinion in *People* v. *Brigham* (1979) 25 Cal.3d 283 [157 Cal.Rptr. 905, 599 P.2d 100]. In *Brigham* the court disapproved use of former CALJIC No. 22 (rev.) in connection with the previous version of CALJIC No. 2.90. CALJIC No. 22 (rev.) defined "moral certainty" as " 'that degree of proof which produces conviction in an unprejudiced mind.' "[6] (25 Cal.3d at p. 290.) The court concluded the instruction had "serious flaws" because "CALJIC No. 2.90 speaks of an 'abiding conviction;' former CALJIC No. 22 (rev.) speaks only of 'conviction.' The lasting, permanent nature of the conviction connoted by 'abiding' is missing and the juror is not informed as to how strongly and how deeply his conviction must be held. Thus, former CALJIC No. 22 (rev.) may allow a juror to conclude that he or she could return a guilty verdict based on a strong and convincing belief which is something short of having been 'reasonably persuaded to a near certainty.' [Citation.]

"Since Penal Code section 1096 outlines the definition of reasonable doubt as contained in CALJIC No. 2.90, jurors should not be confused by having the weaker language of former CALJIC No. 22 (rev.) read with the stronger language of CALJIC No. 2.90." (*Id.* at pp. 290-291, fn. omitted.) Thus "abiding conviction" was found to adequately convey the requirement that the jurors' belief in the truth of the charge must be both long lasting and deeply felt. Nonetheless Light argues the phrase does nothing to distinguish reasonable doubt from other lesser standards of proof.

Justice Mosk agreed with the *Brigham* majority's disapproval of CALJIC No. 22 (rev.) but, in a lengthy concurring opinion, pointed out what he

[5]Light proposes the following addition to the instruction: " 'An abiding conviction based on proof beyond a reasonable doubt is the highest level of certainty recognized in the law. Proof beyond a reasonable doubt requires a degree of certainty which is greater than the next lower standard of clear and convincing evidence, which lower standard requires evidence so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind. An abiding conviction sufficient to meet the higher standard of proof beyond a reasonable doubt is also one which is lasting and permanent in nature.' "

[6]The entire instruction read: " 'The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind.' " (25 Cal.3d at p. 290, fn. 8.)

considered to be several "equally glaring deficiencies" in CALJIC No. 2.90. (*People* v. *Brigham, supra*, 25 Cal.3d at p. 292 (conc. opn. of Mosk, J.).) Although he identified "moral certainty" as the phrase most deserving of criticism, he also found fault with "abiding conviction." "First, what is an 'abiding' conviction? Again the word has an antique ring: while it may have been current in 1850, it has long since fallen into disuse and is no longer part of our daily speech. As with the phrase 'moral evidence,' the jurors are left without guidance from the trial court as to its intended meaning." (*Id.* at p. 299.)

Nevertheless, viewed in its entirety, Justice Mosk's concurring opinion lends little support to Light's position that CALJIC No. 2.90 must be rewritten to more completely define the degree of certainty necessary to overcome a reasonable doubt: "Happily there is another alternative, a solution adopted by fully half of the states of the Union and long advocated by leading scholars. These authorities recognize that all attempts to define the phrase 'beyond a reasonable doubt' are at once futile and unnecessary. They are futile because, as we have seen, the definition is more complicated than the phrase itself and results in confusing rather than enlightening the jury; and they are unnecessary because 'beyond a reasonable doubt' is not a technical legal term requiring learned explanation, but a phrase of common meaning and usage that is known to and understood by the average juror. From these premises both courts and Legislatures have concluded that in criminal cases the jury should simply be instructed on the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, with no effort being made to define the latter phrase." (*People* v. *Brigham, supra*, 25 Cal.3d at p. 308 (conc. opn. of Mosk, J.).)

The Constitution does not require anything more.

■■ "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.' [Citation.]" (*Victor* v. *Nebraska* (1994) 511 U.S. 1, __ [127 L.Ed.2d 583, 590, 114 S.Ct. 1239, 1243].)

In *Victor*, the United States Supreme Court upheld the constitutionality of the former version of CALJIC No. 2.90 against a challenge focusing on its

use of the phrases "moral evidence" and "moral certainty." The court found the reference to "moral evidence" to be "unproblematic" because, viewed in context, it "can only mean empirical evidence offered to prove such matters —the proof introduced at trial." (*Victor* v. *Nebraska, supra*, 511 U.S. at pp. __-__ [127 L.Ed.2d at pp. 594-596, 114 S.Ct. at pp. 1246, 1247].) The court was more concerned with the possibility that the jury might understand "moral certainty" to mean "something less than the very high level of probability required by the Constitution in criminal cases." (*Id.* at p. __ [127 L.Ed.2d at p. 596, 114 S.Ct. at p. 1247].) However it concluded: "Although in this respect moral certainty is ambiguous in the abstract, the rest of the instruction . . . lends content to the phrase. The jurors were told that they must have 'an abiding conviction, to a moral certainty, of the truth of the charge.' . . . An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof. [Citations.] And the judge had already informed the jury that matters relating to human affairs are proven by moral evidence . . . ; giving the same meaning to the word moral in this part of the instruction, moral certainty can only mean certainty with respect to human affairs. As used in this instruction, therefore, we are satisfied that the reference to moral certainty, in conjunction with the abiding conviction language, 'impress[ed] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused.' [Citation.]" (*Ibid.*)

Although it held the reference to "moral certainty" did not render the instruction unconstitutional, the court said: "At the same time, however, we do not condone the use of the phrase. As modern dictionary definitions of moral certainty attest, the common meaning of the phrase has changed since it was used in the [*Commonwealth* v. *Webster* (1850) 59 Mass. (5 Cush.) 295] instruction, and it may continue to do so to the point that it conflicts with the [*In re Winship* (1970) 397 U.S. 358 (25 L.Ed.2d 368, 90 S.Ct. 1068)] standard [of proof beyond a reasonable doubt]." (*Victor* v. *Nebraska, supra*, 511 U.S. at p. __ [127 L.Ed.2d at p. 597, 114 S.Ct. at p. 1248].)

Our own Supreme Court has since reviewed California's reasonable doubt instruction in light of this language in *Victor*, leading to the revised version at issue in this case. In *People* v. *Freeman, supra*, 8 Cal.4th 450, the court considered a modification to the earlier version of CALJIC No. 2.90 which told the jury in essence that ". . . the phrase 'moral evidence' meant mortal evidence, or evidence from people or from the mouths of people." (8 Cal.4th at p. 502.) The court concluded the modification was consistent with the meaning given to the phrase by the court in *Victor*. (*Id.* at pp. 504-505.) But it went on to say:

"Although modifying the standard instruction is perilous, and generally should not be done, today it might be more perilous for trial courts *not* to

modify it in a narrow and specific manner in light of the high court's statement that the instruction's 'common meaning . . . may continue to [change] to the point that it' becomes unconstitutional. (*Victor* v. *Nebraska, supra,* 511 U.S. at p. __ [127 L.Ed.2d at p. 597, 114 S.Ct. at p. 1248].) A slight modification in view of that decision might be deemed safe, indeed safer than not making it. The high court made clear that the terms 'moral evidence' and 'moral certainty' add nothing to the jury's understanding of reasonable doubt. It thus seems that trial courts might, in the future, safely delete the following phrases in the standard instruction: 'and depending on moral evidence,' and 'to a moral certainty.'

"Making these changes, and no others, would both avoid the perils that have caused appellate courts to caution trial courts against modifying the standard instruction, and satisfy the concerns the high court has expressed regarding that instruction. In light of Penal Code section 1096a, we cannot and do not require trial courts to change the standard language; rather, we note that it is permissible, and safer, to make the narrow changes suggested herein." (*People* v. *Freeman, supra,* 8 Cal.4th at p. 504, fn. omitted.)

In response to this suggestion, the Committee on Standard Jury Instructions, Criminal, of the Superior Court of Los Angeles County (the CALJIC committee) adopted the 1994 revision to CALJIC No. 2.90. (Com. to CALJIC No. 2.90 (5th ed. Jan. 1996 pocket pt.) p. 45.)

Light characterizes this judicial history as "dicta upon dicta" which fails to establish that the phrase "abiding conviction" conveys "the very high level of probability required by the Constitution in criminal cases." (*Victor* v. *Nebraska, supra,* 511 U.S. at p. __ [127 L.Ed.2d at p. 596, 114 S.Ct. at p. 1247].) His claim turns on what the *Victor* court meant when it said "[a]n instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." (*Ibid.,* citing *Hopt* v. *People of Utah* (1887) 120 U.S. 430, 439 [30 L.Ed. 708, 711, 7 S.Ct. 614] ["The word 'abiding' here has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence"].)

The court went on to conclude that ". . . the reference to moral certainty, in conjunction with the abiding conviction language, 'impress[ed] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused.'" (*Victor* v. *Nebraska, supra,* 511 U.S. at p. __ [127 L.Ed.2d at p. 596, 114 S.Ct. at p. 1247].) Light would interpret the court's statement to mean that "abiding conviction" alone does not convey the requisite level of

certainty. The court in *Freeman* reached a different conclusion. Referring to the quoted passage from *Victor*, it said: "The high court made clear that the terms 'moral evidence' and 'moral certainty' add nothing to the jury's understanding of reasonable doubt. It thus seems that trial courts might, in the future, safely delete the following phrases in the standard instruction: 'and depending on moral evidence,' and 'to a moral certainty.'" (*People* v. *Freeman, supra,* 8 Cal.4th at p. 504, fn. omitted.) The court thus gave its approval in advance to the 1994 revision to CALJIC No. 2.90 doing just that. The court's conclusion the changes were permissible, albeit dictum, is nonetheless highly persuasive. (*Evans* v. *City of Bakersfield* (1994) 22 Cal.App.4th 321, 328 [27 Cal.Rptr.2d 406].) Therefore, for the reasons expressed in *Freeman,* we reject Light's objections to the instruction.

II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Wiseman, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 14, 1996.

---

*See footnote 1, *ante,* page 879.