[No. A075845. First Dist., Div. Two. Mar. 4, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
SIDNEY ALFONZO HAYNES, Defendant and Appellant.

COUNSEL

Richard Such and Cynthia A. Thomas, under appointments by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, George F. Hindall III, Assistant Attorney General, and Moona Nandi, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**LAMBDEN, J.**—Defining the scope of aiding and abetting liability for robbery is a task which has occupied our appellate courts often in recent years. In this unusual case, we consider the added complexity arising when the direct perpetrator attacks the same victim twice in close succession, for the same property. Was there one robbery or two? When did each begin and end? When does this matter? These and other questions are posed in claims of instructional error and insufficient evidence raised by Sidney Alfonzo Haynes (defendant) following his jury-trial conviction and sentence for second degree robbery. (Pen. Code, §§ 211-212.5.) We will affirm the judgment.

BACKGROUND

The trial showed that Christopher Shaver was robbed of $170 in cash by an unidentified and unapprehended teenage male (the robber), assisted by defendant, who appeared on the scene in a blue Geo Metro. The incident consisted of two encounters. In the first, the robber struggled with Shaver in a parking lot, through Shaver's open car window, and took part of the cash when it tore in half as Shaver drove away. Defendant arrived during this time and kicked Shaver's passenger side window. Shaver then left the lot, and defendant followed, the robber now his passenger, and brought Shaver to a stop some blocks away. There the robber struggled with Shaver a second time, getting the rest of the cash, and defendant drove the robber away. We set out in some detail eyewitness testimony by Shaver, his passenger Donald Chasteen and defendant, to frame certain evidentiary and instructional issues.

*Shaver.*

Around 1 p.m. on December 14, 1995, eighteen-year-old Shaver left work and drove in his car with coworker Donald Chasteen to a bank where he

cashed his paycheck, receiving eight $20 bills and one $10 bill. As the two later drove past the parking lot at Tarantino's Fish Market in Vallejo, Shaver saw a friend, Warren Gibson, wave him over. He made a U-turn, pulled into the lot and double-parked. A crowd of young people was there, probably from a nearby high school. Gibson asked for a ride to get some food, and Shaver let him into the backseat. Shaver, too, wanted something to eat and sat in the car, his window rolled down and the engine running, thumbing through his cash.

Shaver had noticed an unfamiliar male teenager (the robber) walking toward his window but did not turn to look until he was about five feet away. The robber leaned in the window, grabbed Shaver's money with his left hand and with his right began hitting him in the face. Still holding his money in his own left hand, Shaver put the car in gear. It lurched forward about 10 feet before he realized he could go no further because a car was blocking his way. The robber now quit hitting him but, still holding onto the money, bit hard into Shaver's coverall-clad left arm. Shaver put the car in reverse and backed up 30 or so feet past the driveway and onto Nebraska Street. Midway, the robber let go of Shaver and the money tore in half. The robber kicked the door as he left with his part of the money. Shaver repocketed his own half and "[v]aguely" saw the robber run down the sidewalk east on Nebraska toward some cars. He did not see whether the robber ever reached the intersection (Broadway) or got into any car. In backing out of the lot, Shaver had noticed for the first time a blue Geo Metro parked behind him with its door open. He did not hit the Geo but had to swerve to avoid it. Sometime during the encounter with the robber, someone (he did not see who) kicked at his passenger side window, knocking off an interior molding.

Shaver put the car in a forward gear, sped down Nebraska and ultimately made a circle through a series of right turns, stopping to oblige his passenger Gibson, who asked to be let out of the car. (Testimony conflicted whether Gibson got out at Illinois Street, Arkansas Street or after they were back in front of Tarantino's.) Shaver went around the block because, as he had left the parking lot driveway (or 50 some feet further, at the intersection of Nebraska and Broadway), he noticed the Geo following him, with the robber in the right front passenger seat. The Geo followed him at three or four car lengths' distance. Shaver managed to get ahead enough to let Gibson out, but as Gibson got out, the Geo was behind him again.

Shaver started around the block once more, and when the Geo pulled up along his left side on Illinois Street, Shaver stopped suddenly. So did the Geo—close enough that Shaver could not open his door completely. He and the robber got out, each banging the other's door in the process, which

provoked the driver of the Geo to say something like, "Don't screw up my paint." The robber said something about having dropped his keys in Shaver's car. Shaver, ready to fight, tried to grab his money back from the robber. The robber punched him two or three times in the face, and Shaver grabbed the robber's arm and shoulder. With his last blow, the robber reached into Shaver's pocket, pulled out the other half of the money and got back into the Geo. Shaver got his first look at the driver (defendant) then, as the car drove away. He memorized the license plate number and gave it to a police officer at the high school about five minutes later.

Shaver was treated for a bite injury to his arm and, at a police showup, identified defendant as the Geo driver. He did not actually ever see defendant get out of the car.

*Chasteen.*

Passenger Chasteen testified similarly in most respects but had paid more attention to defendant's arrival in the Geo and actions afterward. He related the drive to the bank and into the parking lot where Gibson, a 16- or 17-year-old high school student to whom Chasteen was related, got in. Chasteen saw the Geo pull into the lot behind them, after the robber had begun his assault. Defendant (whom he had seen on the *passenger* side) got out, came to the passenger side window where Chasteen sat and kicked at it five or six times, dislodging a trim piece but not breaking the glass. Chasteen recalled striking a blow to the top of the robber's head while the robber leaned inside to wrestle with Shaver over the money. Chasteen vacillated, however, on whether this blow came before, during or after defendant kicked at the window. He corroborated the car having lurched forward and then sped backward out to the street, having to swerve around the Geo. He heard the robber demand "Give me your money" and saw him strike Shaver "profusely." Shaver never struck the Geo, and defendant did not arrive in his Geo with the robber inside.

Chasteen saw the bills tear in two and Shaver place his half in a "slash pocket" in his coveralls. Unlike Shaver, he saw defendant get back into the car and did not see the robber run down Nebraska street but, instead, saw him get into defendant's Geo and leave with defendant.

Chasteen's account of the pursuit differed as to where they let Gibson out but corroborated Shaver about coming to a stop hemmed in by the Geo on the left (plus a large diesel truck parked on the right). Chasteen remembered the robber getting out first and assaulting Shaver through the driver's window. The robber reached inside and said he wanted the rest of the money

and had dropped a key. He reached for the ignition key, saying this was "so you don't go nowhere until I have mine." Then they struggled and traded blows until the robber took the rest of the money from Shaver's pocket. Only then, when the robber allowed him room to do so, did Shaver get out of the car. More blows were exchanged toward the rear of the cars before the robber finally asked if Shaver had "had enough" and sped off in the Geo with defendant driving. During the fray, defendant never fought but stood outside the Geo's driver side watching over the car roof. Chasteen found himself too close to the truck to get out and help, and he never heard anyone say anything about Shaver having almost hit the Geo.

Shaver and Chasteen drove to the high school and each identified defendant as the driver at the police showup.

*Officer Risk.*

Vallejo Police Officer Peter Risk, who interviewed Shaver and Chasteen after the incident, corroborated much of their accounts through what they told him. Differences included their failure to mention Gibson and, at the second encounter, Shaver having *dropped* the rest of his money and defendant having gone to the passenger side of Shaver's car.

Risk had gone to the residence of the Geo's registered owner and there detained defendant for the showup identifications. At the police station, after his arrest, defendant was searched and found to have a torn-in-half $10 bill in his shoe.

*Defendant.*

Defendant did not deny being the driver of the Geo but claimed ignorance of the robbery until it was over and no intent to assist a robbery. Nineteen years old at the time of the incident, he said he pulled into the parking lot (at 12:10 p.m.) to play dice with Vallejo High School students. He parked his Geo and left its door open as he went to a craps game. He had noticed the person leaning into Shaver's car and, recognizing him as someone (name unknown) he knew from high school, assumed there was a drug deal going on.

He then heard Shaver's car screech away, heard a boom and heard people in the crowd say "he hit your car." Upset, he ran to his car to follow Shaver's car, and as he did, the robber opened his passenger door and jumped in, uninvited. The two did not speak. When Shaver stopped in the middle of Illinois Street, defendant stopped next to him, got out and asked him why he

had hit his car. Shaver apologized, and the two walked over to examine the Geo's driver door but found no damage. Shaver and the robber then went over to Shaver's car, where Chasteen remained inside, and minutes later began fighting.

During the fight, defendant saw $10 fall to the ground. He picked it up and pocketed it. Following his later arrest, while handcuffed in the back of a patrol car, he put the money in his shoe, fearing police would think he was the robber. After the fight, he went to drive away and the robber again jumped in beside him. Defendant drove around the corner and made him get out there, not wanting any trouble. He had heard Shaver say "I'll give you my money" and assumed there may have been a robbery, although the robber never told him this or showed him any money.

*Rebuttal.*

Officer Risk testified that defendant told him, in the backseat of the patrol car, he never saw any money but thought it was a robbery because of the fighting and the area where it occurred. Risk also testified that he kept an eye on defendant and did not see him move around in a way to make a transfer to his shoe and that such a feat would have been difficult.

## DISCUSSION

### I. *One robbery or two?*

Most of defendant's contentions relate in some manner to this intriguing and unusual circumstance: The incident, although charged as a single robbery of a single victim of cash, might be viewed as two robberies from the standpoint of satisfying the bare elements of robbery. Robbery (Pen. Code, § 211) is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. (*People* v. *Harris* (1994) 9 Cal.4th 407, 415 [37 Cal.Rptr.2d 200, 886 P.2d 1193].) Thus one robbery arguably occurred at the parking lot, once the robber carried away half the victim's money, and a second one arguably occurred after the pursuit, once the robber carried away the rest. This is so because a robbery is "initially" committed for guilt purposes by any slight movement of the loot. (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1165 [282 Cal.Rptr. 450, 811 P.2d 742] (*Cooper*).)

On the other hand, since defendant was prosecuted as an aider and abettor and not as a direct perpetrator, the first act melded into the second.

"For purposes of aider-abettor liability, the commission of a robbery continues so long as the property taken is being carried away to a place of temporary safety. [Citation.] 'The act of "taking" begins when the separation of the victim from his or her property occurs, and it continues through the forcible consummation.' [Citation.]" (*People* v. *Harris, supra,* 9 Cal.4th at p. 421.)

■ Defendant characterizes the facts as showing two robberies. Thus in claiming lack of substantial evidence, for example, he breaks the evidence down, arguing insufficient evidence as to *each*, and tries to create a temporal gap by arguing the robber had reached a place of temporary safety—ending the "first" robbery—once he got into defendant's car to pursue the victim for the "second" robbery. Similarly, defendant invokes two "acts" of robbery to claim a sua sponte duty to give a unanimity instruction and parses those acts to argue prejudice from jury instruction which he says might have led jurors to view aiding and abetting during "escape" always sufficient to convict. (See pts. II., III. & V., *post.*)

In contrast, the Attorney General invites us to hold that only one robbery took place—apparently for all purposes. We decline either party's blanket approach. As our ensuing analysis will show, the issues raised are resolvable not by resort to the number of robberies but, rather, by examining factors such as the continuing nature of the conduct.

## II. *Substantial evidence*

In urging two robberies on the substantial evidence question, defendant invokes the idea that "[i]t is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*Cooper, supra,* 53 Cal.3d at p. 1164.) We accept that premise, of course, but reject defendant's view that the robber had carried away the loot to a place of temporary safety by the time he entered and rode in defendant's car.

■ "Whether . . . the robber has reached a place of [temporary] safety is ordinarily a question of fact; a jury's implied finding on the issue will be upheld so long as supported by substantial evidence. [Citations.]" (*People* v. *Carter* (1993) 19 Cal.App.4th 1236, 1251 [23 Cal.Rptr.2d 888].) We review the whole record, in a light most favorable to the judgment, to determine whether it discloses substantial evidence—evidence which is reasonable, credible and of solid value—whether direct or circumstantial, and even if exculpating inferences might seem to us reasonable as well. (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) ■ The implied finding here is amply supported.

Getting into the car at the parking lot was not enough. "The scene of a robbery is not a place of temporary safety, even if it is the victim and not the robber who attempts to escape. [Citations.]" (*People* v. *Ramirez* (1995) 39 Cal.App.4th 1369, 1375 [46 Cal.Rptr.2d 530].) Defendant and his robber passenger could have used the car in this case to take the loot to a place of temporary safety, but they instead chased after the victim (defendant later to claim only concern over his car being hit), tailed the victim and eventually brought his car to a halt a short distance away, seeking and creating a second encounter where the robber took the rest of the money.

The jury could reasonably find no place of temporary safety was reached. The cases address this issue in a variety of contexts—usually to decide whether an injury, weapon use, killing or some other criminal act occurred in the commission of a robbery (see *People* v. *Fields* (1983) 35 Cal.3d 329, 365-368 [197 Cal.Rptr. 803, 673 P.2d 680] and cases discussed)—but based on policy considerations also present for aiding and abetting. As will be noted later in this opinion, the main difference is that the rule extending liability in these other contexts throughout the time of escape applies to an aider and abettor only where the loot is being carried away to a place of temporary safety at the same time. (*Cooper, supra,* 53 Cal.3d 1158, 1166-1170; see pt. IV., *post.*) That was the case here.

 Temporary safety is not tested based on subjective impressions or recklessness of the robber but on an objective measure of safety following the initial taking. (*People* v. *Ramirez, supra,* 39 Cal.App.4th 1369, 1374-1375.) It also matters little that the victim might have been terrified and trying to leave the scene. (*Ibid.*) A robbery victim in *Ramirez*, for example, was stabbed by the robber while trying to drive out of the parking lot where he had moments earlier been robbed. In upholding this as occurring during the commission of the robbery, the court reasoned: "Where, as here, the robber is content to remain at the scene and the infliction of great bodily injury is close to the robbery in terms of time or distance, the robbery is not 'over.' Phrased otherwise, the robbery is not 'over' until the victim has reached a place of temporary safety." (39 Cal.App.4th at p. 1375.)

More typically, a court examines continuing robber-victim contact not for the victim's safety but for that of the robber. Thus in a case where a captive victim was slain during a car ride hours after captors had robbed her at a residence by forcing her to write a check to them, which they had cashed (*People* v. *Fields, supra,* 35 Cal.3d 329, 364), the court upheld special circumstance murder in the commission of robbery, reasoning: "In an unguarded moment, she might escape, notify the police, and render the . . . residence quite unsafe for defendant. In order to complete a successful

escape with the robbery proceeds, defendant either had to dispose of her, which he did, or flee to some other place which she could not identify for the police. Thus, the trier of fact could reasonable find that defendant's murder was a continuation of the robbery, done because until the robbery victim was killed, [the] home was not a place of even temporary safety." (*Id.* at pp. 367-368, fn. omitted.) In considering "the span in space and time between the taking and the murder" (*id.* at p. 368), the court examined the motivational link between the robbery and killing, namely, to eliminate the witness and punish her for giving over less money than she had: "[T]he murder occurred within a few hours of the robbery, and at a site only a few miles distant, and the events are linked not only by defendant's motives but by his continued control over the victim, forcing her to remain at his house and then transporting her to the murder site. . . ." (*Ibid.*) In its review of precedent on when a robbery ends, the court relied on cases stressing unity of a robber's purpose and the indivisible or continuous nature of the transaction. (*Id.* at pp. 365-367.)

There is support here for a no-place-of-temporary-safety finding whether measured by victim safety, robber safety, robber's common purpose and motive, or the indivisible or continuous nature of the transaction. First, the victim was unsafe the whole time he was followed and eventually forced to a stop for a second encounter. Second, defendant and the robber remained in peril of discovery and capture as they pursued him, drawing attention to themselves by their pursuit and risking retaliation from or physical collision with the victim, who was aware of their pursuit and anxious to elude them. Third, the two incidents were linked by a motive or purpose which was not only related, but identical—to rob the victim of his money. Fourth, the transactional relationship was identical and continuous in space and time. Possible contrary inferences—like defendant's ignorance of the robber's purpose or sole concern for the integrity of his car—were not the only ones jurors could reasonably draw from the total circumstances.

We also reject defendant's suggestion that the robber reached a place of temporary safety with his loot between the time he hung in the window of the victim's car and he hopped into defendant's car for the chase. The only evidence was the victim's testimony. He said that after backing his car out of the driveway onto Nebraska and the money tore in half, he "[v]aguely" saw the robber run east on the sidewalk toward some parked cars. He turned his attention to putting the car in gear to leave and did not see the robber run all the way to the corner (Broadway) or get into any car. The next thing he knew the robber was in the Geo—"this car right behind me [that] came out of the parking lot." Nothing reasonably suggests the robber had reached a place of safety in that fleeting lapse of time. Similarly, while the victim,

Shaver, did stop the car long enough to let his nervous friend Gibson out, this appears to have been fleeting as well, not a point of temporary safety for the victim or the robber.

Having impliedly and properly found no place of temporary safety between the two encounters, jurors were free to find an aiding and abetting act (*Cooper, supra,* 53 Cal.3d 1158, 1164) anytime during the course of events, provided defendant's knowledge and intent to assist arose sometime prior to or during the commission of robbery (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1039 [31 Cal.Rptr.2d 128, 874 P.2d 903]). ■ We have already recited the review standard for substantial evidence (*People* v. *Perez, supra,* 2 Cal.4th 1117, 1124), and factors for determining aiding and abetting of a robbery include presence at the scene of the crime, companionship, and conduct before and after the crime, including flight. (*In re Jessie L.* (1982) 131 Cal.App.3d 202, 217 [182 Cal.Rptr. 396].)

■ Among the more obvious evidentiary choices for jurors were: pulling up behind the victim's car and coming up to the car and kicking the window as the robber wrestled with the victim in the lot; driving the robber in pursuit of the victim's car after half the money had been taken; bringing the victim's car to a stop; standing by at his car while the robber made a second assault at the second location; and then getting back into the car and driving the robber away right afterward. The torn $10 bill being in defendant's shoe also circumstantially implied consciousness of guilt and a knowing involvement in the crime. This is sufficient direct and circumstantial evidence of the requisite act and intent. Contrary inferences were, again, not the only reasonable ones (*People* v. *Reilly* (1970) 3 Cal.3d 421, 424-425 [90 Cal.Rptr. 417, 475 P.2d 649]), and jurors could accept in part and reject in part any witness's testimony (*People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 576 [156 Cal.Rptr. 630]).

### III. *Unanimity*

■ Fearing that jurors may have split their verdict between two robberies, defendant contends the court had a sua sponte duty to instruct, in words patterned on CALJIC No. 17.01, that jurors had to unanimously agree that he aided and abetted at least one of the two. We disagree.

Generally, where evidence shows more than one act which could constitute the charged offense and the prosecutor does not elect to rely on any one such act, a unanimity instruction may be required. (*People* v. *Forbes* (1985) 175 Cal.App.3d 807, 816 [221 Cal.Rptr. 275]; *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280-282 [182 Cal.Rptr. 354, 643 P.2d 971].) Here the parties

again debate whether there were one or two robberies because the unanimity requirement "typically applies to acts that could have been charged as separate offenses. [Citations.]" (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311].) But the question again need not be decided.

Rather, assuming there might have been two chargeable (if not doubly punishable; Pen. Code, § 654) acts, this case falls within an exception to the unanimity requirement. "The unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction. [Citations.] The 'continuous conduct' [exception] applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].)

We hold that the two encounters here were "so closely connected in time" (*People* v. *Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423]) that the exception applied. Defendant stresses room for doubt whether he kicked at the window of the car (only Chasteen identified him as the one), whether he actually aided the robbery by doing so (the timing was vague) or whether he knew at that point that a robbery was in progress. In other words, he relies on there having been somewhat differing available defenses to the acts on which jurors could have relied, and he maintains that jurors who relied on one act would not necessarily have found all of his acts to be culpable.

The parties cite factually inapt cases, overlooking an analogous decision in the multiple-act-robbery context. Victim Atherton in *People* v. *Harris*, *supra*, 9 Cal.4th 407, was held captive for days while the defendant and cohorts used his credit cards to make purchases, and drove him to his home and office for more takings. The Supreme Court found instructional error on the "immediate presence" element of robbery harmless and then, for purposes of remand on a unanimity claim, counseled: "[W]e observe that '[t]he unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction.' [Citation.] Even assuming a defendant, by and through the argument of counsel to the jury, suggests differing defenses to each of the alleged acts, still it must be determined whether there is any 'reasonable basis' for the jury to distinguish between them in determining whether the 'continuous conduct' rule applies. [Citation.] [¶] Here there was an ongoing forcible restraint of the victim throughout his two-day ordeal up until his murder. In particular, he was being held captive along with his stolen car throughout the period during which the office and home takings were accomplished. [Citation.] The takings were

successive and compounding in nature; none of the items of personal property taken from Atherton's home and office were 'carried away to a place of temporary safety' until well after completion of the looting of those premises. [Citation.] We may therefore question whether *any* 'reasonable basis' was available to *legally* distinguish between the four 'taking theories' for purposes of establishing the single count of robbery charged. The successive takings arguably reflected a 'continuing course of conduct,' the central objective of which was to rob Atherton of all of his property wherever it might be located, while forcibly restraining him in his own vehicle and transporting him to the various locations for the purpose of assisting the group in that objective. Indeed, the prosecutor indicated on the record, at the time the trial court rejected the requested unanimity instruction, that only one count of robbery had been charged in this case largely in anticipation that multiple punishments would be unattainable under the proscriptions of Penal Code section 654." (*Id.* at pp. 431-432, fn. 14.)

The case here is clearer. The two encounters were just minutes and blocks apart and involved the same property. The acts were successive, compounding, part of a single objective of getting all the victim's cash, charged as a single robbery, and arguably barred from multiple punishment by Penal Code section 654. Plus, none of the loot was carried away to a place of temporary safety until all of it was obtained. The rationale of *Harris* indicates that no unanimity instruction was needed on these facts. We so hold.

It is also hard to see how defendant was prejudiced by any error. He relies on uncertainty as to his knowledge or acts during the first encounter, wondering if some but not all jurors relied on those acts. However, any juror who did rely on the first encounter surely must have been convinced that defendant had the same knowledge and intent when he drove the robber to the second encounter, halted the victim's car, stood by for the rest of the taking and then drove the robber away. No reasonable juror would have supposed he aided and abetted the first encounter but then engaged in the second one for a *wholly* unrelated concern about whether his car door had been banged.

## IV. *Former CALJIC No. 9.44*

■ Defendant's next claim reprises his two-robbery theme in the context of instruction on when robbery ends for aiding and abetting purposes. In *Cooper*, the Supreme Court held that commission of a robbery continues until *the loot is carried away* to a place of temporary safety; yet it rejected the idea that the offense continues "through *the escape* to a place of

temporary safety, regardless of whether or not the loot is being carried away simultaneously. . . ." (*Cooper, supra*, 53 Cal.3d 1158, 1166.) The escape rule, long applied to determine certain ancillary consequences of robbery, like kidnap for robbery under Penal Code section 209, was held inappropriate for aiding and abetting purposes. A getaway driver, for example, could be more appropriately punished as an accessory after the fact if he gained the needed knowledge and assisted only during an escape and after the asportation of the goods was fully completed. (53 Cal.3d at pp. 1166-1170.)

*Cooper* held former CALJIC No. 9.44 erroneous as capable of "misle[ading] the jury into believing that commission of a robbery continues during the escape to a place of temporary safety even if the loot is not being carried away contemporaneously. [¶] In the future, courts should instruct that for purposes of determining liability as an aider and abettor to robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time and continues so long as the stolen property is being carried away to a place of temporary safety. . . ." (*Cooper, supra*, 53 Cal.3d at p. 1170.) The error was found "harmless beyond a reasonable doubt because the act of carrying away the loot to a place of temporary safety *did* in fact coincide with the escape. The defense did not argue to the contrary, and there was no evidence to support such an argument in any event. On these facts, if the jury found that defendant formed the intent to facilitate or encourage commission of the robbery prior to or during the escape to a place of temporary safety, then such intent was also necessarily formed prior to or during the act of carrying away the loot to a place of temporary safety. Thus, the [instruction's] references to the escape could not have misled the jury with respect to the duration of this particular robbery. . . ." (*Id.* at p. 1171.)

The trial court here instructed on the duration of robbery in compliance with *Cooper* (CALJIC No. 9.40.1 (1991 new)) but inexplicably also gave the disapproved former instruction (CALJIC No. 9.44 (1991 rev.)). The parties agree this was error but disagree whether it was harmless.

We hold it was harmless for, as in *Cooper*, the asportation and escape coincided. Defendant urges the contrary and stresses instructional language (unexplored in *Cooper*) which suggested a place of temporary safety with the loot could only be reached *after* an escape. That language (italics added) states: "A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property *after having effected an escape with such property*." Given contradictory instruction, he contends, jurors could have decided asportation of the loot was over before the escape was accomplished (e.g., when the robber ran briefly down the sidewalk) or, improperly under the language just

quoted, that unchallenged possession of the loot did not matter until after an escape.

We are not persuaded that either possibility mattered on the given facts. We have already explained why no place of temporary safety with the loot occurred between the two encounters and thus why the asportation(s) and escape(s) remained contemporaneous. Defendant's contrary argument rests in part on the idea that a robber is in "unchallenged possession" of loot the moment a victim abandons efforts to recover it. However, this is contrary to our understanding of the *Cooper* majority and is obviously contrary to those cases which consider not just the victim's reaction, but whether continued proximity to the victim (even when fleeing the scene) objectively poses an increased risk of exposure and capture. Here that risk never ceased, and the robber and loot remained together throughout the continuous course of conduct which constituted the offense.

No prejudice from the error in giving former CALJIC No. 9.44 is shown.

### V. *After-formed intent*

Defendant assails the holding in *Cooper* that aiders and abettors remain potentially liable between the initial asportation and reaching a place of temporary safety with the loot, but this is a pro forma challenge. He anticipates we "may be bound" to follow the four-to-three majority in *Cooper* (see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]) but hopes for a change of heart in the Supreme Court given that only one member from the majority (Baxter, J.) but two from the minority (Mosk & Kennard, JJ.) currently sit on the high court. He adopts and praises the "reasons eloquently stated" in the *Cooper* dissent.

He correctly anticipates our response. ██ We have noted: "Although the California Supreme Court is free to overrule its own prior decisions, the doctrine of stare decisis compels lower court tribunals to follow the Supreme Court whatever reason the intermediate tribunals might have for not wishing to do so. [Citations.] There is no exception for Supreme Court cases of ancient vintage." (*Mehr* v. *Superior Court* (1983) 139 Cal.App.3d 1044, 1048, fn. 3 [189 Cal.Rptr. 138].) There is also no exception for Supreme Court cases of more recent vintage where the court's composition has changed.

### VI. *Reasonable doubt*

██ Defendant claims error in giving the 1994 revision of CALJIC No. 2.90, the reasonable doubt instruction. He claims there is a reasonable

possibility the instruction unconstitutionally diluted the reasonable-doubt standard (*In re Winship* (1970) 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368]) by omitting former language—"depending on moral evidence" and "to a moral certainty"—and leaving jurors to ponder unaided the term "abiding conviction," which he claims connoted "at most" only clear and convincing evidence and, at worst, a standard for "duration" but not the "degree of certitude" jurors must have. We reject the argument.

The revised instruction comports exactly with the suggestion of our Supreme Court in *People* v. *Freeman* (1994) 8 Cal.4th 450, 504 and footnote 9 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888] (*Freeman*), following criticism of the former version by the federal high court in *Victor* v. *Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583], and it comports with the statutory mandate as modified to comply in 1995 (Pen. Code, § 1096). The suggestion in *Freeman* may be dictum because not strictly necessary for resolution of the case. (*Gyerman* v. *United States Lines Co.* (1972) 7 Cal.3d 488, 498 [102 Cal.Rptr. 795, 498 P.2d 1043].) Still, Supreme Court dictum can be highly persuasive (*Evans* v. *City of Bakersfield* (1994) 22 Cal.App.4th 321, 328 [27 Cal.Rptr.2d 406]), and this dictum was specifically crafted for use by trial courts statewide. The Supreme Court called its proposed changes "permissible" (*Freeman, supra,* 8 Cal.4th at p. 504), and we deem that pronouncement a binding one (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d 450, 455).

Much of the argument advanced here was considered at length and rejected in *People* v. *Light* (1996) 44 Cal.App.4th 879, 884-889 [52 Cal.Rptr.2d 218] (review den.). We concur in its analysis and follow an unbroken line of cases upholding the revised instruction. (See, e.g., *People* v. *Torres* (1996) 43 Cal.App.4th 1073, 1077-1078 [51 Cal.Rptr.2d 77], review den.; *People* v. *Tran* (1996) 47 Cal.App.4th 253, 262-263 [54 Cal.Rptr.2d 650], review den.; *People* v. *Hurtado* (1996) 47 Cal.App.4th 805, 815-816 [54 Cal.Rptr.2d 853]; *People* v. *Carroll* (1996) 47 Cal.App.4th 892, 895-896 [54 Cal.Rptr.2d 868]; *People* v. *Barillas* (1996) 49 Cal.App.4th 1012, 1022 [57 Cal.Rptr.2d 166], review den.; *People* v. *Godwin* (1996) 50 Cal.App.4th 1562, 1571-1572 [58 Cal.Rptr.2d 545], review den.)

As for "abiding conviction" connoting duration but not the degree of conviction, defendant unduly isolates "abiding." "Abiding" may commonly mean lasting or enduring, without specifying degree, but here it modified the word "conviction," and jurors were told this meant being convinced beyond a reasonable doubt—meaning something more than a "possible or imaginary" doubt. *Freeman* implicitly holds this is sufficient.

Defendant also cites law from other jurisdictions treating the term "abiding conviction" as a clear-and-convincing standard. (E.g., *Colorado* v. *New*

*Mexico* (1984) 467 U.S. 310, 316 [104 S.Ct. 2433, 2437-2438, 81 L.Ed.2d 247].) The jury here, however, was no doubt unaware of the foreign law and presumptively followed only the instructions it was given.

## DISPOSITION

The judgment is affirmed.

Haerle, Acting P. J., and Ruvolo, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 27, 1998.