Filed 12/1/20  P. v. Cubel CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B299491 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA466184) |
| v. | |
| FRANCISCO CUBEL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William N. Sterling, Judge.  Affirmed.

Lori Nakaoka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Francisco Cubel appeals his conviction for making criminal threats (Pen. Code, § 422)[1] on the grounds (1) the court failed to give a unanimity instruction; (2) the evidence was insufficient to support the conviction; and (3) the court erred in admitting evidence of prior uncharged conduct. We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Cubel was charged with making criminal threats against his wife Petrona F. in 2016 and raping her in 2017. (§ 262, subd. (a)(1).) As Cubel was convicted of making criminal threats only, we omit evidence pertaining to the rape charge.

I. ***Petrona F.'s Testimony***

Petrona F. testified she and Cubel were married in 1999 and had four children. Their marriage was unhappy and Cubel was often violent. She said Cubel had begun raping her when she was 14 years old, and all their sexual contact for the duration of their relationship had been against her will. She behaved affectionately with Cubel in front of the children and others so they would think she and Cubel were happy.

Petrona F. testified about one uncharged incident. On a Saturday in 2013 Cubel insulted her, hit her, and kicked her in the abdomen. He threatened to hurt her and her mother and to take the children if Petrona F. called the police. Petrona F. asked why he had to hurt her family; Cubel told her to "shut up" and kicked her leg. Petrona F. was scared and felt ill at the thought Cubel would harm her family. Later that day, Cubel offered Petrona F. money for sex. When she declined, he forced her to have sex with him

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Petrona F. did not go to the police immediately. It was the weekend and Cubel was around constantly. She was afraid all weekend and Cubel continued to mistreat her. Monday morning, once Cubel had left for work, Petrona F. took the children to a friend's home and reported Cubel to the police. She reported Cubel had kicked her leg but did not tell the police he had raped her. Petrona F. and the children stayed with her friend for two weeks, but she and the children returned home when Cubel promised to change.

On September 23, 2016, Petrona F. was in the kitchen and the three younger children were in the bedroom of the family's one-bedroom apartment when Cubel called Petrona F. into the bathroom to talk. She did not want to go into the bathroom but complied when Cubel told her it would "get worse for" her if she did not. Cubel attempted to force Petrona F. to ingest drugs, but she refused.

While the couple was in the bathroom their oldest child Brandon and Cubel's brother David[2] arrived home and knocked on the bathroom door. Cubel opened the door, told David not to get involved, grabbed and shoved him, and attempted to stab him with a kitchen knife. Petrona F. intervened, took the knife away from Cubel, and threw it into the kitchen. Cubel retrieved the knife, but Brandon approached him, crying and asking why he was behaving this way.

Petrona F. attempted to calm Brandon, David and Cubel exchanged words, and David left. Cubel turned his attention

---

[2] Because the appellant, the children, and David share a surname, we refer to the children and David by their first names for clarity.

3

back to Petrona F., saying, "If you call the police, remember you have your mom in Guatemala. I'm going to tear her apart. Once I'm done with your mother, I'm going to go ahead with your sisters. You'll get me killed in jail. I'm not the only person around. My family is also around." He also said, "You have hurt how many people in Guatemala and them hanging from the trees?"

Petrona F. took Brandon into the bedroom, where the younger children were, because Cubel continued to threaten to hurt her "with any object, like, for example, hammer." Cubel began to kick the door, trying to enter the room. Petrona F. blocked the door with a couch and called 911. The recording of the 911 call was played for the jury. While Petrona F. was on the phone she could hear Cubel rummaging in the kitchen. She was scared Cubel would hurt her with a knife and afraid he would harm her in front of the children.

Cubel left the apartment when he heard Petrona F. call the police. He returned the following day and apologized, saying he had been drunk. About a week later, Petrona F. unsuccessfully attempted to get a restraining order against Cubel because she was still afraid.

On cross-examination, Petrona F. admitted a prior petty theft conviction. She had learned in a domestic violence class that undocumented domestic violence survivors could obtain a "U" visa if they cooperated with law enforcement. Petrona F. denied applying for a "U" visa or speaking with anyone about them outside of class. She denied offering to help David's girlfriend obtain one.

Petrona F. also testified on cross-examination Cubel was visibly drunk during the incident and was nearly falling down.

4

Because Cubel was threatening her, Petrona F. later told the police she did not want to pursue criminal proceedings against him.

II. ***Brandon's Testimony***

Brandon, who often heard his parents argue, confirmed Cubel was verbally abusive to Petrona F.  Cubel yelled and called Petrona names, kicked her, punched her, and sometimes dragged her by the hair.  Cubel threatened Petrona F. not to call the police:  " 'If you do that, I will kill you.  I'll kill your family members.  I will mix your blood,' or stuff like that; any kind of threat that has to do with killing."  It happened "[p]retty often," "[l]ike, five times a week."

Brandon was 17 or 18 years old in 2016.  He and his uncle David came home around 9:00 p.m. or 10:00 p.m. and found the other children crying.  Brandon could hear Cubel yelling in the bathroom and Petrona F. saying, "No, I don't want to do it."  He listened to his parents for about three minutes before he asked David to intervene.

David knocked on the door, and Cubel demanded to know what he wanted.  David said he needed to use the bathroom.  Cubel opened the door, came out of the bathroom, and "got right up in [David's] face."  They argued for about five minutes.  Cubel went to the kitchen and returned holding a knife.  He approached David threateningly as if to stab him.  David left the apartment.

After David left, Brandon took the knife away from Cubel and hid it.  Cubel retrieved another knife from the kitchen.  Brandon took that knife too and threw it across the kitchen.  Petrona F. was scared, the younger children were screaming, and they were all crying.  Petrona F. went into the kitchen to prepare food for the children, but she went into the living room when

5

Cubel began calling her names.  Cubel yelled, " 'If you call the police, I'm going to mix your blood,' or something like that, 'I'm going to drink it.  I'm going to cut you up into small little pieces just like I'm going to do to your family.' "

Petrona F. sent the younger children into the bedroom. Brandon stayed with his parents, "trying to reason with [Cubel], telling him to calm down, to maybe possibly leave, just leave us alone."  Petrona F. also attempted to calm Cubel down.

Cubel said if Petrona F. called the police, he would hurt her and "cut [her] in little pieces."  Brandon continued to try to calm Cubel and to reason with him, but Cubel kept yelling at Petrona F.  Brandon estimated he and Petrona F. spent almost an hour trying to calm Cubel down.  Cubel was "just saying more nonsense."

Eventually Cubel went into the bathroom.  Petrona F. and Brandon went into the bedroom and locked the door.  They pushed a couch against the door and then Petrona F. called 911. She was crying and shaky, her eyes were red, her hair was disheveled, and her voice cracked as she spoke.

Cubel kicked the door, and then Brandon heard him moving things in the kitchen.  Cubel returned and announced if they did not open it he would find a way in.  Brandon's siblings were scared, shaking, and silent.  Brandon was afraid of what Cubel would do to Petrona F. if he managed to enter the bedroom. Petrona F. looked worried while she waited for the police.

Cubel left before the police arrived.  The police spoke primarily with Petrona F. and asked Brandon only a few questions.  He told the police what had happened but did not mention the knives.

Cubel came back to the apartment later in the night or early morning. To Brandon's knowledge Petrona F. did not call the police when he returned.

Brandon understood a "U" visa would allow him to travel internationally, and he had talked with his mother about how nice it would be to have one because he wanted to go to Guatemala to visit his grandmother. His grandmother had recently taken ill, leading Brandon to ask the investigating officer on the case about "U" visas shortly before trial. Petrona F. had told Brandon getting a "U" visa was not a priority for her.

Brandon acknowledged telling a social worker after the 2016 incident that Cubel was not abusive and he was not afraid of Cubel. The following year he told another social worker there was no physical abuse in the home. Brandon had lied and failed to disclose information to the social workers at his parents' direction. Cubel had instructed the children never to say anything bad about him to a social worker and to deny abuse and neglect. Petrona F. told them to lie because she feared they would be taken away.

III.  ***Other Testimony***

Cubel and Petrona F.'s daughter, Susan, age 11 at the time of trial in 2019, recalled she was helping her mother in the kitchen when her father became angry and yelled at her mother. Susan did not remember what he was screaming about. Susan and Petrona F. went in the bedroom. Petrona F. locked the door and they moved a couch. Cubel banged on the door. Petrona F. called the police and said, "[H]e is coming. And she just start[ed] screaming."

Susan, who tried not to listen to her parents' arguments and often played music when they argued, lay on the bed with

7

her brother and sister and listened to music while Brandon talked with their mother. Her sister Juana looked at her phone. Cubel eventually left, and the police arrived. Susan did not recall later telling a social worker she was not scared of her parents, this was the first time she saw her parents fight, and she felt safe with her father.

Juana, age 14 at trial, testified she went into the bedroom that night because Cubel was yelling at Petrona F. Juana did not remember words her father used, but his voice was angry and it scared her. They moved a couch in front of the door. Cubel yelled angrily and kicked the door hard. He told Petrona F., "Get outside because I'm gonna hurt you." Juana did not remember how Cubel said he was going to hurt Petrona F. Petrona F. was scared, shaking and crying, and Brandon hugged her. Juana and her siblings were in the bed. She did not remember how long they were in the bedroom, whether they listened to music, or whether she used her phone. She did not recall telling a social worker she was not afraid of Cubel, he was a good dad, and she had never seen violence between her parents before.

A police officer who responded to Petrona F.'s 911 call testified Petrona F. was nervous and shaking, and she had visible redness and swelling on her right arm and right leg. Brandon said Cubel had grabbed Petrona F. by the arm and kicked her leg. Brandon did not describe Cubel threatening to kill Petrona F., pulling out a knife, or threatening to drink Petrona F.'s blood.

A detective spoke with Petrona F. in October 2016. Petrona F. confirmed the information the responding police officers had put in their report, but she did not want to pursue criminal proceedings against Cubel. She said Cubel was "a nice guy as long as he wasn't drunk," and he had not bothered her

8

since the incident. It was not uncommon for a victim of domestic violence to downplay or minimize the perpetrator's actions.

An employee of the Los Angeles Police Department testified two U visa applications had been filed for Petrona F. in 2014. Both were denied because Petrona F. had failed to cooperate with law enforcement.

The defense called the police officer who took Petrona F.'s report in 2013 to testify. The officer testified Petrona F. had reported Cubel kicked her leg when she refused him sex. She did not mention threats to kill, being kicked in the stomach, or being raped, and she also said she left the home the same day rather than a few days later. Petrona F. had a visible bruise above her right knee.

David testified Cubel and Petrona F. had a "normal" and "fine" relationship until Petrona F. was unfaithful. David once heard Cubel curse at Petrona F. after she told him she did not love him anymore and to leave. Petrona F. and Cubel were disrespectful to each other when they argued. Petrona F. would tell him to shut up or she would call the police and he would go to jail and lose his home. She would provoke Cubel, they would argue, Petrona F. would ask forgiveness, and things would return to normal. They held hands, hugged, and spent time with family.

David testified about the 2016 incident. He found Petrona F. and Cubel angrily arguing through the bathroom door about their marriage. Petrona F. was yelling, and Cubel was asking her personal questions. Petrona F. told Cubel, "Don't ask me things. Leave from the house or else I'll call the police." The younger children were in the living room but Brandon was in the room while they argued.

Cubel left the restroom when David said he needed to use it. Cubel, frustrated and angry, told David he wanted to fix things with his wife but she would not communicate. Cubel did not try to attack David that day and there was no confrontation. Cubel simply went into the living room and sat down to play with the children. This took place around 7:00 p.m. David left later in the evening. While David was there he did not see Cubel pull out a knife.

Cubel's sister testified she believed Petrona F. was unfaithful, although she also defined infidelity so broadly as to include a woman speaking with a man other than her husband. She had seen Petrona F. talking with another man and believed Petrona F. was cheating because she stopped talking to the man when she noticed Cubel's sister watching. Cubel's sister had seen Cubel and Petrona F. argue and she had seen them behave affectionately. Petrona F. had never told her Cubel forced her to have sex with him. Petrona F. had once said she wanted to get rid of Cubel and get her "papers." She had mentioned something about U visas before 2017, possibly in 2014. Petrona F. said, "This man does not have any money. And one day he'll go to jail."

David's girlfriend testified she had only seen Petrona F. happy; Petrona F. never told her about the 2013 or 2016 incidents, said Cubel raped her, or said she was scared to call the police or tell anyone about Cubel. In 2017 Petrona F. had advised her if she ever had problems with David, Petrona F. could help her get the information she needed in order to get a U visa. In 2017 she heard Petrona F. call Cubel a "fucking idiot"; he did not respond. Petrona F. had once, in 2017, asked her to lie to Cubel while Petrona F. went to see her lover.

A detective testified that in 2018 Juana said she had never observed Cubel being violent, and in 2019 Susan said she did not recall her father ever hurting her mother or speaking to her mother about hurting her.

A social worker who had interviewed members of the family in 2017 testified that Brandon had said he was not afraid of anyone in the home, sometimes his parents argued but had never been physical, and the first time an argument between his parents became physical was in 2017. Juana said she had never witnessed physical violence in the home. It was not unusual for children to be reticent to discuss problems in the home due to fear, guilt, a sense of responsibility to their parents, or safety concerns.

During deliberations, the jury asked for readback of two pieces of evidence, one of which was Brandon's testimony about the 2016 incident, "specifically describing any verbal threats from the defendant." The jury found Cubel guilty of making criminal threats and was unable to reach a verdict on the spousal rape charge. The court declared a mistrial on the rape charge, and it was subsequently dismissed. Cubel appeals.

## DISCUSSION

### I. *Absence of an Unanimity Instruction*

Cubel argues the trial court erred in not instructing the jury it must unanimously agree upon which of Cubel's September 23, 2016 threats against Petrona F. was the basis for the criminal threats charge. We review this instructional issue de novo (*People v. Covarrubias* (2016) 1 Cal.5th 838, 919) and conclude there was no error.

11

"A unanimity instruction is required if there is evidence that more than one crime occurred, each of which could provide the basis for conviction under a single count." (*People v. Grimes* (2016) 1 Cal.5th 698, 727 (*Grimes*).) A prosecutor's express election of acts upon which he or she intends to rely as proof of each charged offense may relieve the trial court of the obligation to instruct on the unanimity requirement if the prosecutor's election is communicated to the jury "with as much clarity and directness as would a judge in giving instruction. The record must show that by virtue of the prosecutor's statement, the jurors were informed of their duty to render a unanimous decision as to a particular unlawful act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539.) The People assert they made an election when the prosecutor in closing argument relied on threats to hurt Petrona F. and her family in a grotesque manner, but while the prosecutor did refer to Cubel's statements about hanging people from trees and drinking blood, he did not inform the jury it could not rely on other evidence and it had to agree unanimously as to the facts underlying each count. The prosecutor's argument was insufficient to establish an election.

Cubel argues there was evidence of a wide variety of acts the jury could have found constituted a criminal threat, and it cannot be determined whether the jury agreed unanimously on any one as the basis for liability. He argues the jury could have found the criminal threat to be his comment he would "make it worse" for Petrona F. if she did not come into the bathroom; his pledge to tear apart her mother and sisters if she called the police; his threat to hurt her with an object; his statement he would mix Petrona F.'s blood and cut her and her family into small pieces if she called the police; the death threat she reported

to 911; or, more generally, the near-daily threats of physical harm Brandon reported Cubel making.

We disagree the statement Cubel would make it worse for Petrona F. if she did not enter the bathroom could have supported a separate conviction for making criminal threats. This statement, while undoubtedly menacing, is so non-specific that no reasonable jury could have concluded it was a threat to commit a "crime which will result in death or great bodily injury," nor could a reasonable jury have found it "so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (§ 422, subd. (a).) Similarly, the record offers no reason to believe the jury may have convicted Cubel of making criminal threats based on Brandon's brief testimony that Cubel threatened Petrona F. most days of the week. Not only was the date of the offense clearly identified by the People, there was no evidence these nonspecific frequent threats were to kill or cause great bodily injury. Nor were they so clear, immediate, unconditional and specific that they communicated to Petrona F. a serious intention and the immediate prospect they would be carried out, or caused Petrona F. to be in sustained fear. Accordingly, these acts, while threatening in the colloquial sense, fall short of the legal standard for a criminal threat and could not have offered a basis for conviction here. We " 'presume that jurors are intelligent and capable of understanding and applying the court's instructions.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 515.)

That leaves Cubel's promise to tear apart Petrona F.'s mother and sisters if she called the police; Petrona F.'s testimony Cubel said he would hurt her with an object; her report in the

13

911 call that Cubel was threatening to kill her; and the threat reported by Brandon that Cubel would cut Petrona F. and her family into small pieces if she called the police. To the extent these were distinct threats rather than variations across accounts or a later report of a threat already made, no unanimity instruction was required. A unanimity instruction "is not required ' "where multiple theories *or acts* may form the basis of a guilty verdict on one discrete criminal event." ' " (*Grimes, supra*, 1 Cal.5th at p. 727.) A defendant's separate acts do not suggest more than one discrete crime—and thus do not necessitate a unanimity instruction—if they "are so closely connected," including closely connected in time, "as to form part of one transaction." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100; *People v. Crandell* (1988) 46 Cal.3d 833, 875, abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365.) Courts are more likely to view separate acts as forming part of one transaction "when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*Stankewitz*, at p. 100.)

Contrary to Cubel's argument the various threatening statements he made were "distinct incidents separated by time and space," Cubel's threats were so closely connected spatially, temporally, and contextually that they constituted part of one transaction. Cubel's statements were closely connected in time: over the course of an hour he threatened physical injury to his wife and her family until she was able to usher her children to relative safety and call for help. All the events occurred within a one-bedroom apartment, and they were all part of a single incident in which an enraged Cubel threatened to kill Petrona F.

14

while she attempted to defuse the situation and extricate herself and her four children from the danger he posed. After they disarmed the ranting Cubel, Petrona F. and Brandon attempted to calm him, and Petrona F. directed the three younger children into the bedroom. When Cubel stepped away to use the bathroom, Petrona F. and Brandon seized their opportunity and fled to the bedroom as well. There Petrona F. locked the door, barricaded herself and her children inside, and summoned police.

Cubel's threats were all of a piece: They were directed to one person, Petrona F., although he at least once expansively threatened to harm Petrona F.'s family in another country in addition to killing her; and to the extent the statements indicated a motive, they had the same apparent motive of dissuading Petrona F. from calling the police. Additionally, Cubel offered one defense—the threats, if they were made at all, did not place Petrona F. in sustained fear, and he was voluntarily intoxicated. There was no reasonable basis for the jury to distinguish between the threats. On analogous facts, courts have consistently concluded no unanimity instruction was necessary. (E.g., *People v. Percelle* (2005) 126 Cal.App.4th 164, 182 [defendant's acts occurred during a little over a one-hour period; no unanimity instruction required]; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 275 [multiple false statements to fraudulently obtain benefits made during a single medical visit; no unanimity instruction required]; *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1296 [defendant's acts occurred "just minutes and blocks apart and involved the same property"; no unanimity instruction required]; *People v. Mota* (1981) 115 Cal.App.3d 227, 233 [multiple sexual assaults over the course of one hour; no unanimity instruction required].) There was no error here.

15

## II. *Sufficiency of the Evidence*

Cubel claims the evidence was insufficient to support his conviction for making criminal threats because the prosecution failed to prove the threat was so clear, immediate, unconditional and specific that it communicated a serious intention and immediate prospect that it would be carried out. " ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213.) " '[A]n appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding.' [Citation.] We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency. [Citation.] Rather, before we can set aside a judgment of conviction for insufficiency of the evidence, 'it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support [the jury's finding].' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144–145.)

The evidence was sufficient to support the conviction. Both Petrona F. and Brandon testified to Cubel's threats and the fear they caused her. Given Cubel's prior domestic violence and the fact he had just armed himself with a knife in a physical confrontation with his own brother, a jury could easily conclude Cubel's threats to kill Petrona F. and to cut her and her family into small pieces if she called the police were so clear, immediate, and specific that they communicated to her a serious intention and the immediate prospect the threat would be carried out. Petrona F.'s statements to the police and her 911 call indicated she feared Cubel and believed he would carry out his threat.

Cubel points out Petrona F. and Brandon had "credibility problems," but we neither reweigh the evidence nor reevaluate witness credibility. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) He asserts neither Brandon nor Petrona F. "seemed concerned about appellant's alleged threats" while the incident was taking place, but there was evidence that during this time Petrona F. removed her three younger children from Cubel's immediate presence; she and Brandon attempted to reason with and calm Cubel as he raved; and she and Brandon escaped to and barricaded themselves in the bedroom as soon as Cubel turned his attention away from them. The jury could reasonably have understood the events not as a display of indifference but as an attempt to defuse the situation and to devise an escape for Petrona F. and her children. If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid.*)

17

Cubel's final challenges to the sufficiency of the evidence concern Brandon and Petrona's conduct after the incident. He argues Brandon's later statements to the police and a social worker "undermined []his testimony" Petrona F. appeared afraid of Cubel when she called 911, and Petrona F.'s desire not to prosecute and her description of Cubel as a "nice guy" when he was not drinking "were indicative that she did not perceive appellant's alleged threats as a 'clear, immediate, unconditional, and specific' communication that he 'seriously' intended to immediately carry out his threat." Here again Cubel invites the court to reevaluate credibility and reweigh the evidence. " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.) The evidence was sufficient to support Cubel's conviction.

III. ***Admission of Uncharged Acts***

Over defense objection, the trial court admitted evidence of the uncharged 2013 rape, threats, and domestic violence. Cubel argues the evidence was inadmissible as propensity evidence; and even if it was admissible under Evidence Code section 1109, it should nonetheless have been excluded as more prejudicial than probative under Evidence Code section 352. We review the court's ruling on the admissibility of evidence for an abuse of discretion (*People v. Lewis* (2001) 25 Cal.4th 610, 637), and conclude the evidence was properly admitted.

Although evidence of a person's past conduct is generally not admissible to prove a propensity to commit the charged crime (Evid. Code, § 1101, subd. (a)), Evidence Code section 1109, subdivision (a)(1) provides, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." For the purposes of Evidence Code section 1109, domestic violence "has the meaning set forth in Section 13700 of the Penal Code," and if the act occurred no more than five years prior to the charged offense, as here, it also has the broader meaning set forth in Family Code section 6211. (Evid. Code, § 1109, subd. (d)(3).)

Both section 13700 and Family Code section 6211 define domestic violence as abuse committed against specified categories of people, including spouses. (§ 13700, subd. (b); Fam. Code, § 6211.) Section 13700, subdivision (a) defines abuse as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." Family Code section 6203 defines abuse for purposes of Family Code section 6211 and the Domestic Violence Prevention Act (DVPA), stating it is "not limited to the actual infliction of physical injury or assault." (Fam. Code, § 6203, subd. (b).) Abuse under the DVPA includes not only "intentionally or recklessly caus[ing] or attempt[ing] to cause bodily injury," sexual assault, and "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another" (Fam. Code, § 6203, subd. (a)(1)-(3)), but also conduct that may be enjoined under Family Code section 6320, including "molesting, attacking,

19

striking, stalking, threatening, sexually assaulting, [and] battering." (Fam. Code, §§ 6320, subd. (a), 6203, subd. (a)(4).) Cubel's 2013 uncharged conduct clearly falls within these statutory definitions of domestic violence. (See, e.g., *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144–1145 [prior stalking of wife was domestic violence admissible under Evid. Code, § 1109]; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 892–896 [evidence of assault on family dog in front of family was domestic violence admissible under Evid. Code, § 1109].)

Based on *People v. Zavala* (2005) 130 Cal.App.4th 758, in which the court ruled stalking is not domestic violence within the meaning of Evidence Code section 1109, Cubel argues making criminal threats is not a crime of domestic violence. *Zavala* is inapposite. The *Zavala* court concluded stalking was not domestic violence as defined by section 13700 because stalking "does *not* require that the threat induced the victim to fear great bodily injury or death." (*Zavala,* at p. 771.) But a "reasonable apprehension of imminent serious bodily injury to himself or herself" (§ 13700, subd. (a)) is required for the offense of making criminal threats: To constitute a criminal threat, the threat must be to commit a crime "which will result in death or great bodily injury to another person," it must "convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," and the victim must reasonably be in sustained fear for his or her own safety or that of his or her immediate family. (§ 422, subd. (a).) Additionally, the *Zavala* court considered only whether stalking was domestic violence under section 13700, not under Family Code section 6211. Making criminal threats against a spouse falls within the

20

definition of domestic violence under both statutory definitions of domestic violence contemplated by Evidence Code section 1109.

Cubel argues even if the evidence was admissible under Evidence Code section 1109, it should have been excluded because it was uncorroborated, Petrona F.'s testimony was contradictory, it was placed in front of the jury first to bolster the People's weak case on the charged offenses, and it was inadmissible under Evidence Code section 352. The trial court did not abuse its discretion. The 2013 uncharged conduct was highly probative because it involved similar threats and was relevant to the element of sustained fear. It was not remote, as it occurred just a few years before the charged offenses, nor was it particularly inflammatory, as the conduct alleged was comparable to the charged offenses. The chronological presentation gave the jury context for Petrona F.'s description of her feelings and behavior in later incidents. Petrona F.'s credibility, the absence of corroborating evidence, the circumstances of her report of the incident, and inconsistencies in her testimony were all factors for the jury to consider in evaluating the value and weight to accord the evidence, but they do not demonstrate an abuse of discretion in admitting it.

21

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


          STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.