Filed 4/15/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045212 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. Nos. C1518795, C1756994) |
| v. | |
| FRANCISCO BURGOS et al., | |
| Defendants and Appellants. | |

This case concerns the retroactivity of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which made numerous changes to the law governing gang-related offenses. A jury found appellants Francisco Burgos, James Daniel Richardson, and Damon Stevenson Jr. guilty of second degree robbery with true findings on gang enhancements. The trial court sentenced each appellant to 21 years in prison.

Appellants raise numerous claims including insufficient evidence and the retroactivity of Assembly Bill 333. The Attorney General concedes Assembly Bill 333 is retroactive insofar as it amended the requirements for proving a gang enhancement. But he contends the section of the bill adding Penal Code section 1109 (allowing the defense to request a bifurcated trial on a gang enhancement) does not apply retroactively.

We conclude the evidence was sufficient to support the convictions. We hold Assembly Bill 333 applies retroactively, and we conclude there are no grounds for treating one section of the bill as prospective-only. Therefore, Penal Code section 1109 also operates retroactively. We will reverse the judgments of conviction, vacate the gang enhancements, and remand to the trial court.

Appellants raise numerous other claims including evidentiary error, instructional error, and ineffective assistance of counsel, but we do not reach those claims.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged each appellant with two counts of second degree robbery. (Pen. Code, §§ 211, 212.5, subd. (c).)  As to each count and defendant, the prosecution alleged that a principal personally used a firearm in the commission of the offense (Pen. Code, § 12022.53, subds. (b) & (e)(1)), and that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)).  The prosecution further alleged each defendant had been convicted of prior serious felony offenses (Pen. Code, §§ 667, subds. (a), (b)-(i), 1170.12).  As to Burgos, the prosecution alleged he had served a prior prison term (Pen. Code, § 667.5, subd. (b)).  As to Stevenson, the prosecution alleged he was on felony probation at the time of the offenses.  (Pen. Code, § 1203, subd. (k).)

The prosecution also charged codefendants Derrik Lozano and Gregory Byrd with the same offenses.  Before trial, Lozano agreed to plead guilty to one count of second degree robbery and active participation in a criminal street gang in exchange for a stipulated sentence of three years.

Trial began in January 2017, and the jury reached verdicts in March 2017.  The jury found Burgos, Richardson, and Stevenson guilty on both counts and found true the gang allegations.  The jury hung on the firearm allegations and found Byrd not guilty on both counts.  After a bench trial, the court found true the prior conviction allegations as to Burgos and Stevenson.  Richardson admitted his prior conviction.

---

[1] Richardson also petitions this court for a writ of habeas corpus.  (*In re Richardson*, H047955.)  We deny his petition as moot in a separate order on this date.

As to each defendant, the trial court imposed an aggregate term of 21 years, consisting of six years for robbery, 10 years for the gang enhancements, and five years for the prior felony offenses.

## B. Facts of the Offense

The prosecution alleged appellants were members of the Crip criminal street gang who robbed two men at gunpoint in San Jose on August 29, 2015.[2] The victims were Gabriel Cortez and Danny Rodriguez. Rodriguez had no arms. The victims told police a group of four to six men with a gun approached them, asked about their gang status, and took their phones and wallets. The prosecution alleged that the robbers consisted of the three appellants together with Gregory Byrd and Derrik Lozano.

At the time of the offense, Byrd lived in an apartment at a complex near Bowling Green Drive and King Road in San Jose. He testified that around 9:30 or 10:00 p.m. on the night of the robbery, Byrd, Lozano, and appellants were at the apartment complex. At some point after midnight, appellants and Lozano left to go to the store. Byrd testified that they came back to the apartment about 15 minutes later. Between 12:08 and 12:28 a.m., at a 7-Eleven near the location of the robbery, video cameras recorded appellants and Lozano inside the store.

Just before the robbery, Rodriguez and Cortez were eating at a Chinese restaurant nearby. Around midnight, they left the restaurant and were walking near the 7-Eleven when a group of men approached them from the direction of the store. Rodriguez later told police it was a group of five or six men. Cortez later told police there were maybe four or five men in the group. The men were wearing black or dark blue clothing. Rodriguez told police they all wore plain t-shirts with no writing on them.

The men started asking Rodriguez and Cortez where they were from and whether they "banged." The victims responded that they were from "right here," and the men

---

[2] Section II.B.2 below sets forth the evidence of the gang allegations.

3

asked them whether they were from "Meadowfair." One of the men asserted, "Well, we're Crip." It appeared to Rodriguez that the men were about to let them go when the biggest man in the group asked the victims what they had in their pockets. The man pulled up his shirt to reveal a gun, pulled down a ski mask, and told the victims to empty their pockets. Rodriguez responded, "Bro', I don't even have arms. I can't. You know I can't." The man approached Rodriguez, pulled out his wallet and phone, and opened the wallet, whereupon the man saw it was empty. The man dropped the wallet but kept the phone. Someone pointed a gun in Cortez's face and took his wallet and phone out of his pockets. Cortez had about $250 in his wallet. One of the men then told the victims, "See that guy with the gun . . . . you guys got 30 seconds to get out of my face."

After the robbery, the victims ran to Cortez's home and Rodriguez called his father to come pick him (Rodriguez) up. Rodriguez told his father that a group of men with a gun had robbed him (Rodriguez) and Cortez, taking their wallets and phones. As Rodriguez's father was driving him home, Rodriguez saw the men who robbed him standing on the corner of Bowling Green Drive and King Road. When Rodriguez and his father reached their home, the father called 911 and they reported the robbery. The father told the 911 operator his son had been robbed by five black men with a gun 15 minutes earlier, and that three of the robbers had been at the corner of Bowling Green Drive and King Road five minutes earlier.

Police arrived at the apartment complex at Bowling Green Drive and King Road around 1:00 a.m. The location was about 50 to 100 yards from the 7-Eleven. As they pulled up, the police saw three black men standing near the apartment complex. One of the men was wearing a "very, very noticeable teal shirt," or a "bright teal" or turquoise shirt. The three men immediately started running into the apartment complex.

The police set up a perimeter around the apartment complex and watched the exits to ensure nobody else went in or out. They saw Byrd standing on a second-floor balcony "kind of . . . peeking out." About 25 minutes after police saw the three men run into the

4

apartment complex, Byrd came out of the complex and contacted the police. He told the police he wanted to move his car, which was parked in a fire lane, so that it would not get towed. Police later determined the car was owned by Lozano's girlfriend, Cynthia Capito, who was outside the apartment complex. At some point, Capito consented to a search of the car, and the police found Rodriguez's stolen phone inside it.

The police detained Byrd and conducted an in-field showup of Byrd for Rodriguez. Rodriguez positively identified Byrd as the robber with the gun and described him as the main suspect.

Shortly thereafter, the police took appellants, Lozano, and another man named Keison Hames out of Byrd's apartment. The police conducted in-field showups of each person for Rodriguez one at a time. First, the police showed Hames to Rodriguez, but Rodriguez did not recognize him. Next, they showed Stevenson to Rodriguez. Rodriguez recognized him as being present during the robbery. After the police then showed Burgos to Rodriguez, however, he said Burgos looked similar to Stevenson, and he could not be sure about either of them. The police showed him Lozano next, and Rodriguez said he did not recognize him. Finally, they showed him Richardson, and Rodriguez said he was not a participant.

The police then conducted in-field showups with Cortez and showed him Lozano, Stevenson, Burgos, Richardson, and Hames. They did not show him Byrd. An audio recording of the showup conflicts with police testimony about the order in which the suspects were shown to Cortez. The audio transcript appears to show Lozano was presented first, and Cortez identified him as the person who "dug inside my pocket." Next, Cortez identified Stevenson as "kind of" familiar. Cortez said he thought Stevenson "was just there" and did not touch Cortez, but Cortez felt a little threatened by his presence. The officer who conducted the showup testified that Cortez was presented with Stevenson first, and that Cortez said Stevenson was the one who went through his pockets. The officer testified that Cortez said Lozano "was just present" and did not do

5

anything. Cortez identified Burgos as "the one who took my wallet." When the officer asked Cortez if he was positive Burgos was the one who took his wallet, Cortez responded, "Oh, yeah." When Cortez was shown Richardson, he said Richardson was the one who told them to empty their pockets and that Richardson had also put his hands in Cortez's pockets. Cortez did not recognize Hames.

Neither victim identified any of the defendants at trial. When the prosecutor asked Rodriguez whether it would refresh his recollection to view a transcript of his in-field showup, Rodriguez responded in the negative, adding, "I don't want to remember." When asked about details of the robbery and what he had told the police, Rodriguez repeatedly responded, "I don't know," or "I don't remember." Cortez also testified that he was unable to recall details of the robbery. He testified that he had been intoxicated, having taken two Xanax pills, drinking for several hours, and smoking concentrated marijuana on the night of the robbery.

In a search of Byrd's apartment, the police found Cortez's stolen phone inside a backpack. They also found a blue t-shirt that appeared to be the same shirt police saw on one of the men standing outside the apartment complex when the police first arrived. Appellants, Lozano, and Byrd were all excluded as potential contributors to DNA recovered from the t-shirt. On Rodriguez's stolen phone, found in Capito's car, the police found a fingerprint that matched Lozano's fingerprints.

## II. DISCUSSION

### A. *Sufficiency of the Evidence Supporting the Robbery Convictions*

All three appellants contend the evidence was insufficient to support the robbery convictions. Richardson and Burgos argue the evidence was insufficient to support the identification of them as the robbers. Stevenson concedes substantial evidence shows he was present during the robbery, but he argues the evidence was insufficient to show he directly participated in the robbery or aided and abetted it. The Attorney General contends the evidence was sufficient to support the identification of Richardson and

6

Burgos because Cortez identified them as robbers, and because the overall fact pattern corroborates that finding. As to Stevenson, the Attorney General contends the evidence was sufficient to show he aided and abetted the robbery or conspired with the others in its commission.

### 1. Legal Principles

"To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citing *People v. Maury* (2003) 30 Cal.4th 342, 403.) The record must disclose substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*) The substantial evidence must be reasonable, credible, and of solid value. (*Ibid.*) We review the evidence "in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support' the jury's verdict." (*Ibid.*) The standard is the same under both the California Constitution and the federal Constitution. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

### 2. Substantial Evidence Supports the Robbery Convictions

Richardson and Burgos challenge the sufficiency of the evidence supporting the identification of them as the robbers. They characterize the identification by Cortez as uncorroborated; they point to conflicting testimony; and they argue the substantial evidence standard of review allows us to reject the evidence as too weak to sustain their convictions.

We are not persuaded. Even if we rejected the Cortez identification as insufficient evidence when considered in isolation, other facts presented at trial comprised additional circumstantial evidence sufficient to support the jury's finding. The evidence showed all

7

three appellants—who were Crip gang members—were together at Byrd's apartment complex before the robbery, and video camera evidence showed them at the nearby 7-Eleven right around the time of the robbery. They were seen together again in Byrd's apartment after the robbery, and Cortez's stolen phone was found in the apartment. Appellants were also seen together with Lozano, and Rodriguez's stolen phone was found in Lozano's girlfriend's car. Viewing this record as a whole, together with Cortez's identification, the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that appellants were the robbers.

Stevenson does not dispute that he was present during the robbery, but he argues the evidence was insufficient to find he actively participated in the crime, or that he aided and abetted it. He points out that Cortez said the person he identified as Stevenson did nothing during the robbery apart from being present. The Attorney General argues the evidence showed Stevenson aided and abetted the robbery or conspired with the others in its commission.

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) " 'Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.' [Citations.] 'To be liable for a crime as an abettor, the accused must have instigated or advised the commission of the crime or have been present for the purpose of assisting the crime. He must share the criminal intent with which the crime was committed. Neither his mere presence at the scene of the crime nor his failure, through fear, to prevent a crime establishes, without more, that an accused was an abettor.' [Citation.]" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 57-58 (*Pettie*).) "[F]actors for determining aiding and abetting

of a robbery include presence at the scene of the crime, companionship, and conduct before and after the crime, including flight." (*People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.)

The record holds evidence of several factors from which a reasonable juror could infer guilt on a theory of aiding and abetting or conspiracy. As the Attorney General points out, Stevenson was a "continuous constituent" of the group that committed the robbery—before, during, and after the offense, as the group moved from the apartment complex and the 7-Eleven and then back to the apartment complex again afterwards. Rodriguez told police that the group approached him and Cortez together just before initiating the robbery. The jury could reasonably infer that Stevenson intended to participate in a "show of force" as one member of the larger group outnumbering the victims. (See *In re Juan G.* (2003) 112 Cal.App.4th 1, 5 [reasonable to infer minor aided, promoted, and encouraged robbery based on his prior companionship, presence at crime scene, proximity to victim, and flight from the scene]; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409-410 [reasonable to infer aiding and abetting where defendant approached victims together with codefendant and remained present in front of victims while codefendant used a firearm to rob them]; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095 [similar facts].)

Furthermore, the prosecution's gang expert testified that being a member of a Crip gang involved a tacit agreement to commit violence and assist or join in on acts of violence. Thus, the fact that appellants were all members of the same Crip gang, when considered together with the evidence of Stevenson's conduct before, during, and after the crime, would support an inference that he intentionally aided and abetted the robbery. (See *Pettie*, *supra*, 16 Cal.App.5th at p. 59 [reasonable to infer aiding and abetting based on defendant's presence during attempted murder together with gang expert's testimony that gang members were expected to assist in assaults]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [reasonable to infer gang-related intent].)

9

For the reasons above, we conclude the evidence was sufficient to support the robbery convictions of all three appellants.

## B. *The Effect of Assembly Bill No. 333*

Effective January 1, 2022, Assembly Bill 333 substantially changed the law governing gang-related offenses. Assembly Bill 333 amended Penal Code section 186.22 in several ways, requiring a more stringent showing to prove a gang enhancement. Assembly Bill 333 also added Penal Code section 1109, which allows the defense to request a bifurcated trial on gang enhancements.

Appellants contend they are entitled to retroactive application of Assembly Bill 333, and they argue their underlying convictions as well as the gang enhancements must be vacated. The Attorney General concedes that the portions of the bill amending Penal Code section 186.22 apply retroactively, such that the gang enhancements should be vacated and the matter remanded. Appellants contend we must reverse the robbery convictions as well because the new Penal Code section 1109 allows for bifurcated trials on gang enhancements, and the trial in this case was not bifurcated. The Attorney General argues appellants are not entitled to retroactive application of Penal Code section 1109.

For the reasons below, we conclude Assembly Bill 333 applies retroactively, including the section that added Penal Code section 1109. We further conclude this requires us to vacate the convictions and remand the matter for possible retrial.

### 1. *Legal Background*

Penal Code section 186.22 sets forth an enhanced punishment for a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).)[3] A "criminal street gang" is "any

---

[3] All references are to the revised statute.

10

ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (*Id.*, subd. (f).)

Assembly Bill 333 narrowed the definition of "criminal street gang" to "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).)

The revised statute also requires additional proof regarding the predicate offenses that make up a "pattern of gang activity" as follows: (1) the offenses must have "commonly benefited a criminal street gang" where the "common benefit . . . is more than reputational"; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; and (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons. (Pen. Code, § 186.22, subd. (e)(1).) Courts had construed the prior version of the statute to allow the currently charged offense to be used as a predicate offense, but the revised statute provides that the currently charged offense cannot be used as a predicate offense. (Pen. Code, § 186.22, subd. (e)(2).)

With respect to the "common benefit," the statute provides that "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or

11

silencing of a potential current or previous witness or informant." (Pen. Code, § 186.22, subd. (g).)

Assembly Bill 333 also added Penal Code section 1109, requiring trial courts to conduct a bifurcated trial on gang enhancements if the defense requests one. (Pen. Code, § 1109, subd. (a); Stats. 2021, ch. 699, § 5, eff. Jan. 1, 2022.) The defendant's guilt on the underlying offense must first be determined, and a trial on the gang enhancement is held only if the defendant is first found guilty of the underlying offense. (Pen. Code, § 1109, subds. (a)(1) & (a)(2).)

### 2. Factual Background

Investigator Michael Whittington testified as the prosecution's gang expert. He opined that Crip gangs are criminal street gangs whose primary activities include robbery, felony assault, and illegal weapon possession. Their territory included the area near the robbery. "Varrio Meadowfair" is the name of a rival Norteño gang that is active near the area of the robbery. Whittington opined that appellants and Lozano were Crip gang members. Whittington testified that a robbery like the one committed here would be perpetrated at the direction of, and for the benefit of, the Crip gang.

To prove the predicate offenses, the prosecution introduced evidence of four prior offenses in addition to the current robbery: (1) attempted robbery by Latwan Langston in 2010; (2) assault with a deadly weapon by Darius McNary in 2013; (3) illegal gun possession by Troy Giamona in 2013; and (4) unlawful possession of a loaded unlicensed gun by Stevenson in 2014. The prosecution proved the predicate offenses with certified records of conviction, and Whittington testified that the offenders were Crip gang members. Except for Stevenson's prior gun possession and the current offense, the prosecution presented little or no evidence concerning the facts and circumstances of the predicate offenses.

12

### 3. *Assembly Bill No. 333 Applies Retroactively*

Appellants contend they are entitled to the retroactive application of the revised Penal Code section 186.22 as effected by Assembly Bill 333. They argue that the gang enhancements must be stricken because the prosecution failed to present sufficient evidence to prove all the elements of the enhancements under the revised statute. The Attorney General concedes that appellants are entitled to retroactive application of Assembly Bill 333 insofar as it changed the evidentiary requirements for gang enhancements. The Attorney General disputes that insufficiency of the evidence is the proper legal framework for analyzing the issue, but he concedes the enhancements must be vacated. He argues we should remand the matter to give the prosecution the opportunity to prove the enhancements under the revised statute while leaving the robbery convictions intact.

We accept the Attorney General's concession regarding the retroactive application of the revised Penal Code section 186.22. The Court of Appeal for the Second District recently reached this conclusion in *People v. Lopez* (2021) 73 Cal.App.5th 327 (*Lopez*). "As Assembly Bill 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement, we agree with Lopez and the People that Lopez is entitled to the benefit of this change in the law. '[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to pending case.' [Citation.]" (*Id.* at p. 344.) We agree with the analysis in *Lopez* and we apply its holding here.

We also accept the Attorney General's concession that this requires us to vacate the gang enhancements. First, the prosecution used the current offense to prove one of the predicate offenses; the revised statute prohibits this. (Pen. Code, § 186.22, subd. (e)(2).) Second, the prosecution did not present evidence that any of the offenses

benefitted the gang in a way that was "more than reputational." (Pen. Code, § 186.22, subd. (g).)

The Attorney General argues that insufficiency of the evidence is not the proper analytic framework, but he concedes the proof is not in the record. Insofar as a finding of insufficient evidence would implicate appellants' double jeopardy rights, the Attorney General's point is well-taken. "Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence. [Citation.]" (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 72 (*Figueroa*).) In any event, the proper remedy is to vacate the gang enhancements and remand the matter to allow the prosecution the opportunity for a retrial. (*Lopez*, *supra*, 73 Cal.App.5th at p. 346; *Figueroa*, at p. 71.)[4]

### 4. *Penal Code Section 1109 Applies Retroactively*

Appellants further argue they are entitled to the retroactive application of the newly enacted Penal Code section 1109. They argue this requires us to vacate their convictions on counts 1 and 2 and remand for a new trial on those counts, with a bifurcated trial on the gang enhancements if they request it. The Attorney General contends Penal Code section 1109 does not apply retroactively, such that appellants' convictions on the robbery counts must remain intact.

Appellants contend Penal Code section 1109 applies retroactively under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). Under *Estrada*, the question is whether the Legislature intended for the amendment to apply retroactively even without an express statement to that effect. "When the Legislature amends a statute so as to lessen the punishment[,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the

_____

[4] Accordingly, we do not address appellants' claim that the trial court failed to properly instruct the jury on the elements as defined by the revised statute.

14

prohibited act." (*Id.* at p. 745.) *Estrada* "stand[s] for the proposition that (i) in the absence of a contrary indication of legislative intent, (ii) legislation that ameliorates punishment (iii) applies to all cases that are not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.)

In its earliest applications, the *Estrada* rule applied to new laws that expressly reduced the punishment for an offense or eliminated criminal penalties for certain conduct. *Estrada*, for example, gave retroactive application to a statutory amendment that reduced the term of imprisonment and time to parole eligibility for a nonviolent attempt to escape from prison. (*Estrada*, *supra*, 63 Cal.2d at p. 743.) The California Supreme Court then applied the *Estrada* rule to a statutory amendment that merely gave trial courts the *discretion* to reduce an offense to a misdemeanor. (*People v. Francis* (1969) 71 Cal.2d 66.) The Supreme Court then applied *Estrada* to a new law that created an affirmative defense to the transportation of marijuana. (*People v. Wright* (2006) 40 Cal.4th 81.) These later cases showed that the *Estrada* rule may apply to a change in the law even where the defendants in question are not expressly given a lesser punishment as a result of retroactive application.

More recently, the California Supreme Court has clarified the scope of the *Estrada* rule, expressly holding that a new statute may apply retroactively even if it concerns purely procedural changes that do not directly reduce the punishment for a crime. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303 [Proposition 57 applied retroactively even though it did not reduce the punishment for a crime].) In *Lara*, the Supreme Court considered the retroactivity of Proposition 57—a purely procedural change in the law that prohibited prosecutors from charging juveniles with crimes directly in adult court. The Supreme Court recognized that the rationale of *Estrada* applied because the mere possibility of being treated as a juvenile in juvenile court could result in more lenient treatment. The Supreme Court thereby held Proposition 57 was

15

retroactive because it "reduce[d] the possible punishment for a class of persons, namely juveniles." (*Ibid.*)

The Supreme Court then applied this holding in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*). In *Frahs*, the Supreme Court considered the retroactivity of a new law that created a pretrial diversion program for certain defendants with mental health disorders. The Supreme Court concluded the change was retroactive because the new law "by design and function provides a possible ameliorating benefit for a class of persons — namely, certain defendants with mental disorders . . . ." (*Id.* at p. 624.) *Frahs* thereby reiterated the principle that a statute that provides a "possible benefit to a class of criminal defendants" should be applied retroactively in the absence of an express savings clause limiting the statute to prospective-only application. (*Id.* at p. 631.)

Here, as in *Frahs*, the Legislature made no statements in Assembly Bill 333 indicating prospective-only application. The question then is whether the change in law reduces the possible punishment for a class of persons or provides a possible ameliorating benefit to a class of criminal defendants. As explained below, Assembly Bill 333 meets these criteria for retroactive application.

First, the plain language of Penal Code section 1109 makes it applicable to a distinct class of defendants—those charged with gang enhancements under subdivision (b) or (d) of Penal Code section 186.22. (Pen. Code, § 1109, subd. (a).) But the legislative findings in Assembly Bill 333 also show the Legislature intended to reduce punishment specifically for people of color—who overwhelmingly comprise the class of defendants charged with gang enhancements. The legislative findings show this was a central motivation for the bill: "The gang enhancement statute is applied inconsistently against people of color, creating a racial disparity." (Assembly Bill 333, § 2, subd. (d)(1).) "In Los Angeles alone, the state's largest jurisdiction, over 98 percent of people sentenced to prison for a gang enhancement are people of color." (*Id.*, § 2, subd. (d)(4).)

16

The Legislature further found that people of color suffer a disproportionate degree of *punishment* as a result of this disparity: "Current gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live." (*Id.*, § 2, subd. (a).) "Being designated as a gang member or associate negatively impacts a person's criminal legal system contact from start to finish by hindering pretrial release, influencing sentencing, incarceration, parole, and reentry, and can lead to deportation." (*Id.*, § 2, subd. (b).) "The current statute disproportionately impacts communities of color, making the statute one of the largest disparate racial impact statutes that imposes criminal punishments." (*Id.*, § 2, subd. (d)(2).) These statements make clear that one of the Legislature's foremost reasons for enacting Assembly Bill 333 was to ameliorate the disparate levels of punishment suffered by people of color.

The dissent and the Attorney General point out that under section 3 of the Penal Code, "No part of [the Penal Code] is retroactive, unless expressly so declared." But the Attorney General concedes that Assembly Bill 333 operates retroactively insofar as it amended Penal Code section 186.22. The Attorney General argues nonetheless that the section of the bill adding Penal Code section 1109 should be considered in isolation from the rest of the bill. The dissent and the Attorney General characterize the new bifurcation rule as a "prophylactic rule of criminal procedure" designed to enhance the fairness of proceedings, not to ameliorate punishment as defined under *Estrada*. But the legislative findings expressly disprove this assertion, as they repeatedly cite the disparate levels of punishment suffered by people of color under the old law.

The findings further establish that the bifurcation of gang enhancements at trial is intended to ameliorate the prejudicial impact of trying enhancements together with the offense. "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Assembly Bill 333, § 2, subd. (f).) "Gang enhancement

17

evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (*Id.*, § 2, subd. (d)(1).) "California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.]" (*Id.*, § 2, subd. (e).) In other words, one of the ameliorative effects of bifurcation is that some defendants will actually be *acquitted* of the underlying offense absent the prejudicial impact of gang evidence. This increased possibility of acquittal—which necessarily reduces possible punishment—is sufficient to trigger retroactivity under the *Estrada* rule.

The increased likelihood of acquittal at trial is not the only ameliorative effect of bifurcation. The Legislature further found, "The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (*Id.*, § 2, subd. (e).) By reducing the pressure to accept longer sentences, the new bifurcation statute will necessarily reduce the degree of punishment for many defendants charged with gang enhancements, even if they never have to invoke its prophylactic protections at trial. Thus, even considered in isolation from the remainder of the amendments in Assembly Bill 333, the addition of Penal Code section 1109 requires retroactive application under *Estrada*.

Furthermore, we reject the argument that different parts of Assembly Bill 333 should be treated differently under *Estrada*. The Legislature could have added an express savings clause carving out a section of the bill as prospective-only, but there is no such clause, and no indication of any such intent. To the contrary, the legislative findings setting forth the ameliorative purposes of the bill apply to the entire bill, and they specifically address the reasons for the new bifurcation rules.

18

Moreover, as the Supreme Court observed in *Frahs*, the Legislature was aware of *Lara*'s holding that a statute possibly reducing punishment for a class of persons would apply retroactively. "[T]he Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted.' [Citation.]" (*Frahs*, *supra*, 9 Cal.5th at p. 634.) "[T]o rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citation.]" (*Ibid.*) Thus, if the Legislature "did not want the statute to apply retroactively to nonfinal judgments, it needed to clearly and directly indicate such intent in order to rebut *Estrada*'s inference of retroactivity." (*Id.* at p. 635.) This admonition carries even greater weight here. It would be especially incongruous for the Legislature to make one isolated section of a bill prospective-only without stating so expressly, expecting instead that a court would somehow discern this anomaly.

For the reasons above, we conclude Assembly Bill 333 operates retroactively, including the section that added Penal Code section 1109. Because appellants' convictions are not yet final, they are entitled to the benefit of the changes in the law.

The case law does not clearly establish whether or how harmless error analysis applies in this instance. It is difficult to determine how the outcome of the trial would have been affected if it had been bifurcated to try the gang enhancements separately; the nature of the proceeding would have been entirely different. This circumstance likely constitutes "structural error" because it "def[ies] analysis by harmless-error standards." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 280.) "[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being "simply an error in the trial process itself." (*Weaver v. Massachusetts* (2017) 137 S.Ct. 1899, 1907.) Bifurcation necessarily affects the " 'framework within which the trial proceeds.' " (*Ibid.*) And as explained above, the legislative findings in Assembly Bill 333 underscore the inherently prejudicial nature of gang evidence.

19

Even if harmless error analysis is amenable, it is not clear whether we should apply the federal or state law standard.  (Compare *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability of a more favorable result absent the error] with *Chapman v. California* (1967) 386 U.S. 18, 24 [error must be harmless beyond a reasonable doubt].)  The California Supreme Court considered but did not decide this issue in *People v. Wright* (2006) 40 Cal.4th 81 (*Wright*).  In *Wright*, the Supreme Court held that a new law providing an affirmative defense for transportation of medical marijuana applied retroactively, and that the defendant was entitled to a jury instruction on it.  (*Id.* at p. 98.)  The Supreme Court applied a harmless error analysis but found it unnecessary to decide which standard applied because the error was harmless under either the federal or state law standard.  (*Ibid.*)

A single instructional error of the kind considered in *Wright* is far more susceptible to harmless error analysis than the failure to bifurcate a trial on gang enhancements.  Even assuming we must assess prejudice, however, we conclude appellants suffered prejudice under either the federal or state law standard.  First, the evidence identifying them as the robbers was not overwhelming.  As set forth in detail above, neither victim identified any of the appellants at trial, and the evidence of their in-field identifications was somewhat muddled.  The victims described four to six men involved.  One of the charged men (Lozano) pleaded guilty before trial without identifying anyone else, and another one of the defendants (Byrd) was acquitted.  While the 7-Eleven videos put appellants near the scene of the robbery, the evidence did not show them committing the crime.  Similarly, the fact that stolen evidence was found in Byrd's apartment did not establish which of the persons inside the apartment actually stole it.  And Richardson presented plausible evidence that he had been mistaken for Keison Hames, another one of the persons found inside the apartment.  Given this evidence, it is likely the jury relied on evidence of appellants' gang membership in considering the identity issues.  Finally, there was no clear evidence that Stevenson

20

actually did anything during the robbery apart from being present.  As we state above, the jury likely relied on his gang affiliation to infer he aided and abetted the robbery.

For all these reasons, we will reverse the robbery convictions, vacate the gang enhancements, and remand to the trial court for possible retrial under the new laws.

### III.    DISPOSITION

The judgments of conviction are reversed, and the true findings on all gang-related allegations under Penal Code section 186.22 are vacated.  The matter is remanded to the trial court for further proceedings.

_____
Greenwood, P. J.

I CONCUR:


_____
Grover, J.


People v. Burgos et al.
H045212

# Elia, J., Dissenting

I respectfully disagree with the majority opinion's conclusion that Penal Code section 1109's[1] bifurcation provisions are retroactively applicable under *In re Estrada* (1965) 63 Cal.2d 740 to defendants who were tried prior to section 1109's enactment. In my view, section 1109 is not an *ameliorative* statute within the meaning of the *Estrada* rule, and therefore it is subject to the *general rule* that Penal Code provisions are presumed to be prospective only. The legislative history of section 1109 is consistent with this presumption, so I would conclude that section 1109 is not retroactive.

Assembly Bill No. 333 (2021-2022 Reg. Sess.) amended section 186.22 and enacted section 1109. Section 1109, which took effect on January 1, 2022, provides: "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows: [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined. [¶] (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence. [¶] (b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried

---

[1] All statutory references are to the Penal Code.

in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

Assembly Bill No. 333 was accompanied by a litany of legislative findings concerning both section 186.22 and section 1109. Three of these findings are pertinent here: (1) "According to the Committee on Revision of the Penal Code's 2020 report: [¶] . . . [¶] . . . Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people" (Stats. 2021, ch. 699, § 2, subd. (d)(6)); (2) "Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.] The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence" (*Id.*, § 2, subd. (e)); and (3) "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact" (*Id.*, § 2, subd. (f)). In sum, the Legislature found that studies and reports had expressed concerns about the potential prejudice that could arise from trying gang enhancement allegations jointly with substantive offenses and expressed the belief that bifurcation could help reduce the risk of prejudice.

Assembly Bill No. 333's legislative history reflects the Legislature's understanding of how existing law had addressed the potential prejudice from joint trial of gang enhancements and substantive offenses. Trial courts had been granted "broad authority" to "grant bifurcation when requested" where gang evidence might be prejudicial to the defendant in the trial of the substantive offenses. However, the Legislature understood that such requests were "rarely granted" because efficiency concerns weighed against bifurcation. (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended March 30, 2021, pp. 3, 5, 6.)

2

The Committee on Revision of the Penal Code had observed that at least three other states required gang enhancement allegations to be bifurcated at trial. (*Id.* at p. 7.) The purpose of section 1109 was to prevent "highly prejudicial 'gang evidence' " from being presented to a jury before it decided whether the defendant was guilty of the substantive offenses. (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 333, *supra*, as amended March 30, 2021, p. 9.) The Legislature acknowledged concerns about the additional burden that section 1109 would place on judicial resources. (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 333, *supra*, as amended March 30, 2021, p. 11.) It relied on a fiscal analysis of the bifurcation provisions in section 1109 that was based on the assumption that the provisions would apply only prospectively. (Sen. Com. on Appropriations, Analysis of Assem. Bill No. 333 (2021-2022 Reg. Sess.) as amended July 13, 2021, p. 3.)

Assembly Bill No. 333 did not expressly address whether any of its provisions were intended to apply retroactively or only prospectively. "Generally, statutes are presumed to apply only prospectively. [Citation.] However, this presumption is a canon of statutory interpretation rather than a constitutional mandate. [Citation.] Accordingly, 'the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication.' [Citation.] Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively. [Citation.] [¶] In *Estrada* . . . , [the California Supreme Court] held that amendatory statutes that *lessen the punishment for criminal conduct* are ordinarily intended to apply retroactively." (*People v. Frahs* (2020) 9 Cal.5th 618, 627, italics added.) " 'This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology.' " (*Id*. at p. 628.)

"[The California Supreme Court has] applied *Estrada*'s inference of retroactivity to statutes governing penalty enhancements, as well as statutes governing

3

substantive offenses." (*Frahs*, *supra*, 9 Cal.5th at p. 628.) It has "also applied the *Estrada* rule to statutes that merely made a reduced punishment *possible*" by granting a court discretion to impose a lesser punishment. (*Id.* at p. 629.) And the court has applied the *Estrada* rule to statutes that made a reduced punishment possible for a " 'class of persons.' " (*Frahs*, at p. 629.) The *Estrada* rule also has been applied to a statute expanding a defense to a crime. (*People v. Wright* (2006) 40 Cal.4th 81, 95.) All of these applications of the *Estrada* rule were facially "ameliorative" because they either reduced the punishment or created discretion to reduce the punishment for a criminal offense, or narrowed the scope of criminal liability.

In *Frahs*, the California Supreme Court applied the *Estrada* rule to a newly enacted mental health diversion statute that provided eligible defendants with the possible opportunity to avoid penal consequences entirely if they successfully completed diversion. (*Frahs*, *supra*, 9 Cal.5th at p. 631.) It was undisputed in *Frahs* that the diversion statute was "ameliorative" because it potentially eliminated punishment for an offense. (*Ibid.*) Similarly, in *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 (*Lara*), the California Supreme Court applied the *Estrada* rule to an initiative measure that granted courts discretion to bar adult criminal proceedings, and their attendant criminal punishment, for certain juveniles and to require instead that they be subjected solely to juvenile court proceedings, which precluded criminal punishment. As the court noted in *Lara*, "Proposition 57 did not ameliorate the punishment, or possible punishment, for a particular crime; rather, it ameliorated the possible punishment for a class of persons, namely juveniles. But the same inference of retroactivity should apply." (*Lara*, at p. 308.)

Defendants, citing *Estrada*, *Frahs*, and *Lara*, claim that the *Estrada* rule applies here. However, none of those cases or any other has ever applied the *Estrada* rule to a statute, like section 1109, that does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or a defense. Section

4

1109, unlike all of the amendatory statutes to which the *Estrada* rule has been applied, is a prophylactic rule of criminal procedure expressly intended to employ new procedures aimed at enhancing the fairness of future criminal proceedings. It makes no change to any crime or defense and makes no change to any punishment provision, and it does not create the possibility of lesser punishment or any other "ameliorative" benefit from which it could be inferred that failing to extend that benefit retroactively must have been motivated by a "desire for vengeance." (*Frahs*, *supra*, 9 Cal.5th at p. 628.)

The majority opinion mischaracterizes the California Supreme Court's decision in *Lara* as extending the *Estrada* rule to "purely procedural changes that do not directly reduce the punishment for a crime." (Maj. opn., *ante*, at p. 15.) Proposition 57 did not make "purely procedural changes," but instead "directly" provided for the potential substitution of a juvenile disposition for any criminal punishment. This was not a "purely procedural" change. Section 1109, on the other hand, makes a "purely procedural" change to a trial procedure that will not have any impact "directly" or indirectly on *punishment*. While section 1109 clearly applies to a class of defendants, those facing gang enhancement allegations, and was intended to promote fairness and reduce the potential for prejudice, the same could be said for virtually any procedural change, and the bifurcation provisions themselves do not reduce punishment or create the possibility of reduced punishment. Nothing about the bifurcation provisions suggests that failing to extend them *retroactively* could be attributed only to a desire for vengeance, the rationale behind the *Estrada* rule. The majority opinion's mere speculation that a defendant might be acquitted if the gang allegations are bifurcated does not bring section 1109's bifurcation provisions within the *Estrada* rule. (Maj. opn., *ante*, at p. 18)

The majority opinion gives short shrift to the fact that the *Estrada* rule is an exception to the general rule. "No part of [the Penal Code] is retroactive, unless

5

expressly so declared." (§ 3.) Thus, the default presumption, unless the *Estrada* rule applies, is that a new law is *not retroactive*. The *Estrada* rule applies *only* where the new law is "ameliorative" of criminal liability or punishment. The general rule of prospectivity applies here because nothing in section 1109 is ameliorative of criminal liability or punishment. Indeed, the Legislature's express findings and the legislative history affirmatively demonstrate that section 1109 was intended to have a prophylactic effect at future criminal proceedings by mandating new procedures that were designed to reduce the risk of prejudice. The majority opinion cites no authority for applying the *Estrada* rule to a new law of this type. Hence, the general rule applies, and section 1109 is presumptively *not* retroactive.

The majority opinion proclaims that "the legislative findings . . . show the Legislature intended to reduce punishment specifically for people of color." (Maj. opn., *ante*, at p. 16.) It also reasons that "[b]y reducing the pressure to accept longer sentences, the new bifurcation statute will necessarily reduce the degree of punishment for" defendants charged with gang enhancements. (Maj. opn., *ante*, at p. 18.) In addition, the majority opinion rejects any approach that would separately analyze the retroactivity of each amendatory statute contained in a single legislative bill. (Maj. opn., *ante*, at p. 18.)

I disagree with these unsupported claims. While the amendments to section 186.22 are indisputably ameliorative, since they narrow the scope of criminal liability, the majority opinion offers no substantive explanation for why the retroactivity of each amendatory statute in a single legislative bill should not be separately analyzed.[2]

---

[2] Defendants also contend that the *Estrada* rule cannot apply to one section of a legislative bill but not to another, but they too offer no authority for this proposition. The *Estrada* rule depends on whether a particular amendatory statute is ameliorative. Here, a single legislative bill contained both an amendatory statute that was ameliorative and one that was not. I reject the proposition that the *Estrada* rule must apply to both or neither. As always, application of the *Estrada* rule depends on whether the amendment is ameliorative. Section 1109 is not.

6

Many legislative bills amend numerous (sometimes hundreds of) statutes, and whether a specific amendatory statute is subject to the *Estrada* rule depends on the nature of the amendment, not the mere fact that the amendment was enacted in the company of other amendments in a single legislative bill. The majority opinion's claim that section 1109 "necessarily reduce[s] the degree of punishment" finds no support in section 1109's provisions, in the Legislature's findings, or in the legislative history. Although the Legislature expressly intended section 1109 to enhance the fairness of future proceedings, there is a manifest distinction between the Legislature's creation of new criminal procedures designed to enhance fairness and its enactment of provisions that reduce the possibility of punishment. The underlying rationale for the *Estrada* rule is to avoid the inference that the Legislature was bent on vengeance. No such inference arises from the nonretroactivity of section 1109's provisions. Instead, the Legislature has clearly decided that these new procedures offer a better way to avoid the risk of undue prejudice than the previous procedures of discretionary bifurcation coupled with restrictive jury instructions. The majority opinion's attempt to expand the *Estrada* rule beyond its rationale would permit the exception to swallow the general rule of nonretroactivity.

Defendants assert, but do not substantively develop, a claim that it would be a violation of equal protection to fail to apply section 1109 retroactively. " ' " 'The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' " ' [Citation.] . . . '[T]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citation.] The use of the term 'similarly situated' in this context refers only to the fact that ' "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." . . . ' [Citation.] There is always some

difference between the two groups which a law treats in an unequal manner since an equal protection claim necessarily asserts that the law in some way distinguishes between the two groups. Thus, an equal protection claim cannot be resolved by simply observing that the members of group A have distinguishing characteristic X while the members of group B lack this characteristic. The 'similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.)

Defendants make no showing that they are similarly situated to those who have *not yet been tried* with respect to the purpose of section 1109. Since section 1109 creates a new prophylactic procedural rule intended to avoid risks associated with unbifurcated trials, those who have already been tried are not similarly situated to those who have not been tried with respect to the reduction of those risks. These risks were managed by a different mechanism, jury instructions, at defendants' trial, and defendants do not argue that these instructions were inadequate. Because defendants are not similarly situated to future defendants who will be tried under section 1109's procedures, no further equal protection analysis is warranted. In any case, the Legislature had an obvious rational basis for distinguishing between those who have already been tried and those who have not. The preservation of judicial resources alone justifies the differential treatment. Requiring retrial of the substantive offenses in every case in which there were gang allegations would be both disruptive and wasteful of judicial resources precisely at a time when those resources are in short supply. I would find no equal protection violation.

Because I disagree with the majority opinion's determination that section 1109 is retroactive, I respectfully dissent from the majority opinion's conclusion that

8

defendants' convictions on the substantive counts cannot be upheld and that the case must be remanded for possible retrial of the substantive counts. I would remand for a possible retrial of the gang enhancements only.

_____
ELIA, J.

*People v. Burgos et al.*
H045212

| Trial Court: | Santa Clara County Superior Court Superior Court Nos.: C1518795 & C1756994 |
| --- | --- |
| Trial Judges: | The Honorable Cynthia A. Sevely, The Honorable Helen E. Williams |
| Attorneys for Defendant and Appellant FRANCISCO BURGOS: | Laurie Wilmore under appointment by the Court of Appeal for Appellant<br><br>Conrad Petermann under appointment by the Court of Appeal for Appellant |
| Attorneys for Defendant and Appellant DAMON STEVENSON, JR.: | Jean M. Marinovich under appointment by the Court of Appeal for Appellant |
| Attorneys for Defendant and Appellant JAMES RICHARDSON: | Solomon R. Wollack under appointment by the Court of Appeal for Appellant |
| Attorneys for Plaintiff and Respondent THE PEOPLE: | Rob Bonta, Attorney General of California<br><br>Lance E. Winters, Chief Assistant Attorney General<br><br>Jeffrey M. Laurence, Senior Assistant Attorney General<br><br>Alice B. Lustre, Supervising Deputy Attorney General<br><br>John Michael Chamberlain Deputy Attorney General |

People v. Burgos et al.
H045212